854 A.2d 425

Ronald A. YOCCA, Paul Serwonski and Patty Serwonski,
His Wife, and Ronald P. Carmassi, Individually and
On Behalf of all Similarly Situated, Appellees

v.

The PITTSBURGH STEELERS SPORTS, INC., A National Foot-
ball League Franchise, t/d/b/a The Steelers Pittsburgh Football
Club, and The Sports & Exhibition Authority of Pittsburgh and
Allegheny County, Appellants.

Supreme Court of Pennsylvania.

Argued March 2, 2004.

Decided July 20, 2004.

Charles B, Gibbons, Michael J. Manzo, Christine L. Dono-hue, Pittsburgh, for Pittsburgh Steelers Sports, Inc.

James F. Glunt, Mark Raymond Hornak, Pittsburgh, for Sports & Exhibition Authority of Pittsburgh and Allegheny County.

William James Helzlsouer, Dravosburg, for Ronald A. Yocca et al.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

### OPINION OF THE COURT

Justice NIGRO.

Appellants, the Pittsburgh Steelers Sports, Inc., t/d/b/a the Steelers Pittsburgh Football Club, and the Sports & Exhibition Authority of Pittsburgh and Allegheny County (collectively, the "Steelers"), appeal from the order of the Commonwealth Court which reversed the order of the Court of Common Pleas of Allegheny County granting the Steelers' preliminary objections to the class action complaint filed by Appellees, Ronald A. Yocca, Paul and Patty Serwonski, and Ronald P. Carmassi, individually and on behalf of all similarly situated persons who purchased "stadium builder licenses" ("SBLs") from the Steelers. For the reasons that follow, we reverse the Commonwealth Court's order.

This dispute involves the sale of SBLs, which are essentially "licenses" that grant the licensee the right to buy annual season tickets to Pittsburgh Steelers football games. According to Appellees, sometime in October 1998, they received a brochure from the Steelers (the "SBL Brochure" or the "Brochure"), which advertised a new football stadium that the Steelers planned to construct for the Pittsburgh Steelers football team and advised them of the opportunity to purchase SBLs for football games in that stadium. The SBL Brochure explained that the new stadium would be both bigger and better than the existing stadium, Three Rivers Stadium, and

would have more seats closer to the field.[1] *See* R.R. 36a. The SBL Brochure then stated that any person could purchase an SBL for $250 to $2,700, depending on the section in which the SBL purchaser's seat would be located.[2] *See id.* at 44a–45a. According to the SBL Brochure, each SBL purchaser would be assigned a particular seat in the new stadium and have the right and obligation to buy season tickets for that seat as long as the Steelers football team continues to play in the new stadium. *See id.* at 40a–41a, 46a, 109a. However, the Brochure also stated that all SBL purchasers would be free to either transfer their rights to purchase season tickets or terminate their SBLs if at some point in the future they determined that they no longer wanted to purchase season tickets for the seats assigned to them. *See id.*

The Brochure further provided that any person interested in purchasing an SBL was required to fill out the application that was included in the SBL Brochure and submit it along with a non-refundable deposit equaling one-third of the price of the desired SBL seat (or seats) by November 30, 1998. *See id.* at 46a, 49a. A second payment totaling one-third of the amount due was required by October 1, 1999, and a third installment, representing the remaining balance, was to be submitted by October 1, 2000. *See id.* at 49a. The application further asked the SBL applicant to specify the section of the stadium where he would most like to sit (and calculate the amount due for a seat in that section), as well as list those sections of the stadium that were his second and third preferences.[3] *See id.* at 46a. Notably, the SBL Brochure included

1. Specifically, the SBL Brochure stated that the concourses in the new stadium would be twice as wide as those in Three Rivers Stadium and that there would be larger concessions and more restrooms. *See* R.R. 36a. The SBL Brochure also stated that the new stadium would be oval, rather than circular like Three Rivers Stadium, and that as a result, there would be more seats closer to the field. *See id.*

2. The Brochure explained that persons who purchased an SBL would be making a "contribution" to the construction of the new stadium because the money made through the sale of SBLs would be "used exclusively to help build" the new stadium. R.R. 41a.

3. An SBL applicant only had to pay for those seats actually assigned to him. Therefore, if an SBL applicant was ultimately assigned seats in a

two small diagrams of the planned stadium. *See id.* at 44a–45a. The first diagram depicted the general locations of the sections in the lower level of the stadium while the second diagram showed the general locations of the sections in the upper level of the stadium. *See id.* Neither diagram was sufficiently detailed so as to show the number of rows or seats in the sections. *See id.* However, based on the lower level diagram, one of the sections in the lower level, the Club I Section, only appeared to include seats between the twenty-yard lines of the football field. *See id.* at 44a. Similarly, the depictions of certain sections in the upper level diagram, namely, Sections D, E, and F, appeared to show each section as having the same number of rows. *See id.* at 45a.

The SBL Brochure indicated that first priority for seats would be given to those SBL applicants who already had season tickets in Three Rivers Stadium and who applied for seats in a section of the new stadium that corresponded with their current seating sections. *See id.* at 46a, 50a. With regard to those applicants, the SBL Brochure stated: "We will try to assign seats as close to your current seat location as the new stadium seating configuration will allow." *Id.* at 50a. According to the Brochure, after seats were assigned to those applicants with first priority, seats would be assigned to all other applicants based on a "random computerized priority number" placed on every application received by the November 30th deadline. *Id.* at 46a, 50a. Significantly, the SBL Brochure not only made clear that an SBL applicant's first seating preference was "not guaranteed," *id.* at 50a, but also that no SBL applicant was assured the right to purchase an SBL. *See id.* at 46a ("To give yourself *the best chance of securing seating* in the new stadium, you must list your first, second and third preferences. The new seating configuration is much different than Three Rivers Stadium and some Sections are sure to be over-subscribed.") (emphasis added).

section that was not his first choice and that was less expensive than his first choice, the initial deposit overpayment would be applied to any remaining amounts due for the SBL or season tickets.

The SBL Brochure further notified SBL applicants: "You will be mailed a contract by the end of March 1999, notifying you of your Section assignment. The contract must be signed and returned within 15 days. If the completed contract is not returned as required, your season ticket holder discount seating priority and deposit will be forfeited." *Id.* at 50a. According to the SBL Brochure, SBL applicants would be given their actual seat assignments "in the Spring of 2001 after the seats have been physically installed in the new stadium." *Id.* at 49a. Finally, the SBL Brochure included a telephone number for people to call if they had questions about the SBLs. *See id.*

Appellees allege that after reviewing the SBL Brochure, they decided to purchase SBLs. Accordingly, each Appellee completed his application in the SBL Brochure, indicating his seating preferences, and mailed the application and the required deposit to the Steelers by November 30, 1998.[4] In August 1999, the Steelers sent each Appellee a letter (the "August 1999 Letter"), advising them that they had been assigned SBL seats and notifying them of the stadium sections in which their seats were located.[5] The letter also reminded Appellees that they would soon be mailed a contract that they would have to sign to purchase SBLs to the seats assigned to them. A document containing two diagrams (the "August 1999 Diagrams") was attached to the August 1999 Letter to show "the location of all sections." R.R. 142a. Like the earlier diagrams included in the SBL Brochure, the August 1999 Diagrams only offered a general description of the location of each section, and did not indicate how many rows or how many seats were in any given section. However, in spite of the lack of specificity in both sets of diagrams, it was apparent that the parameters of the sections in the August

---

**4.** While Appellees assert that they owned season tickets for Pittsburgh Steelers football games in Three Rivers Stadium when they applied for SBLs, they do not allege that they applied for seats in a section that corresponded with the location of their seats in Three Rivers Stadium.

**5.** The August 1999 Letter reminded Appellees that they would not receive their actual seat assignments until just prior to the 2001 Steelers' football season.

1999 Diagrams varied from those in the earlier diagrams. Specifically, in the August 1999 Diagrams, the Club I Section appeared larger than it had in the earlier diagrams, apparently including seats between the ten-yard lines, instead of only those seats between the twenty-yard lines. In addition, the depictions of Sections D, E, and F in the August 1999 Diagrams no longer appeared to be equal in size, but rather, Sections D and E appeared larger than Section F. Nevertheless, it was still impossible to ascertain the precise sizes of these three sections as the August 1999 Diagrams did not specify the number of rows in each section.

Two months after Appellees received the August 1999 Letter, the Steelers mailed them three documents: (1) a "Stadium Builder License and Club Seat Agreement" or a "Stadium Builder License Agreement" (collectively, the "SBL Agreement" or "Agreement"); (2) a document entitled "Additional Terms and Conditions of Stadium Builder License and Club Seat Agreement" or "Additional Terms and Conditions of Stadium Builder License" (collectively, the "Additional Terms document"); [6] and (3) another copy of the document containing the August 1999 Diagrams.[7] The SBL Agreement was a two-page document requiring the signatures of the named person, partnership, or corporation purchasing an SBL, *i.e.*, the "Licensee," as well as the Public Auditorium Authority of Pitts-

**6.** The "Stadium Builder License and Club Seat Agreement" and "Additional Terms and Conditions of Stadium Builder License and Club Seat Agreement" were provided to those SBL applicants who were assigned SBLs for seats in the club sections, while the "Stadium Builder License Agreement" and "Additional Terms and Conditions of Stadium Builder License" were provided to those persons assigned SBLs for seats in other sections of the stadium.

**7.** The Steelers provided the trial court with copies of the contract documents sent to Appellees and those documents included not only the SBL Agreement and the Additional Terms document, but also a copy of the document containing the August 1999 Diagrams. The trial court subsequently found that the Steelers had indeed sent Appellees a copy of the document containing the August 1999 Diagrams with the SBL Agreement. Notably, Appellees did not contest this finding in their appeal to the Commonwealth Court and likewise, do not contest this finding here. Accordingly, we will accept the trial court's finding that a copy of the document containing the August 1999 Diagrams was sent to Appellees with the SBL Agreement.

burgh and Allegheny County, *i.e.*, the "Authority" or the "Licensor." [8] The Agreement specified the number of SBLs the Licensee would be purchasing, the section (or sections) in which the SBL seats would be located, and the total fee for the SBLs. Moreover, to assist the Licensee in identifying the location of his seats, the Agreement directed the Licensee to Exhibit A, which it described as representing the "Stadium Seating Area." While the document containing the August 1999 Diagrams was not specifically labeled as "Exhibit A," it was clearly meant to be Exhibit A as it was the only document attached to the contract documents, *i.e.*, the SBL Agreement and the Additional Terms document, and as it clearly described the "Stadium Seating Area." [9]

The SBL Agreement also stated that the Licensee and the Licensor agreed to the terms and conditions in the Additional Terms document, which it expressly incorporated by reference as part of the Agreement. The Additional Terms document was a four-page document outlining the use of SBLs (including the fact that the Licensee would be notified of his seats prior to the first season of play in the stadium), the SBL fee, the term of an SBL, a Licensee's duty to continually purchase

8. While the SBL Agreement named the Authority as the Licensor, it also explained that "the Authority will lease the Stadium to the National Football League Franchise owned by Pittsburgh Steelers Sports, Inc. ("Steelers") or an affiliate of the Steelers, and that upon completion of the Stadium the Authority will assign this Agreement to the Steelers or its affiliate." R.R. 125a.

9. Appellees suggest in their brief to this Court that we cannot consider the document containing the August 1999 Diagrams as part of the SBL Agreement because it was not specifically labeled "Exhibit A." *See* Appellees' Brf., at 20 ("No such document has ever been presented to the Plaintiffs which bears a legend Exhibit A. No such document exists."). Indeed, the Commonwealth Court seemed to agree with Appellees in this regard. *See Yocca*, 806 A.2d at 936 n. 5. However, as stated above, the trial court made an unchallenged factual finding that the document containing the August 1999 Diagrams was attached to the SBL Agreement. *See supra* n. 7. Moreover, that document was the *only* exhibit to the SBL Agreement and it specifically depicted the stadium seating area. Under these circumstances, it would border on the absurd to conclude that the document containing the August 1999 Diagrams was not Exhibit A merely because it was not labeled as such on its face. Accordingly, we reject Appellees' suggestion that we reach such a conclusion.

season tickets to maintain his SBL, the terms and conditions associated with transferring an SBL, and the conduct expected of Licensees and their guests.[10] The Additional Terms document also contained a clause stating that the Licensee "has read and understands the terms of this Agreement," R.R. 158a, and an integration clause, which stated as follows:

> *Entire Agreement; Modification.* This Agreement contains the entire agreement of the parties with respect to the matters provided for herein and shall supersede any representations or agreements previously made or entered into by the parties hereto. No modification hereto shall be enforceable unless in writing, signed by both parties.

*Id.* at 159a.

Appellees signed the SBL Agreement and paid the remaining installments due for the SBLs assigned to them. Moreover, in accordance with the provisions in the SBL Agreement, Appellees purchased season tickets for the 2001 Steelers' football season for the SBL seats awarded to them. In the spring of 2001, after all of the seats in Heinz Field were installed, the Steelers informed Appellees of the specific locations of their SBL seats. Appellees subsequently used their seats, and according to Appellees, they immediately discovered that the seats were not located where they expected them to be based on the diagrams in the SBL Brochure. Appellees contend that several of the seating sections surrounding the football field were expanded to include a greater area of seats than shown in the SBL Brochure diagrams. Thus, although Appellees acknowledge that the names of the sections associated with each of their seats are the ones that they had requested to sit in, they assert that their seats are actually in other less desirable and less expensive sections according to the SBL Brochure diagrams.

---

**10.** The Additional Terms document also included a disclaimer clause, a reservation of rights clause, an assumption of risk/liability/indemnity clause, a notices clause, a binding effect clause, *see infra* n. 19, and a clause indicating that the Agreement should be construed and enforced in accordance with Pennsylvania law and that any actions arising out of the Agreement should be brought in the Court of Common Pleas of Allegheny County. *See* R.R. 158–59a

Specifically, Appellee Ronald A. Yocca alleges that he applied for and was awarded two SBL seats in the Club I Section. Mr. Yocca contends that based on the lower level diagram in the SBL Brochure, he reasonably believed that his Club I seats would be located between the twenty-yard lines of the football field. However, Mr. Yocca's seats ended up on the eighteen-yard line, two yards outside of the twenty-yard line. Similarly, Appellees Paul and Patty Serwonski and Ronald P. Carmassi were granted SBL seats in Section D in the upper level.[11] Mr. and Mrs. Serwonski and Mr. Carmassi allege, much like Mr. Yocca, that based on the upper level SBL Brochure diagram, they reasonably believed that their seats would be within the first twelve rows of the upper deck.[12] Their seats, however, are in the sixteenth row of the upper deck.

As a result of their dissatisfaction with their seats, Appellees commenced the instant class action against the Steelers in early August 2001.[13] In their complaint, Appellees initially assert that the Steelers breached their contract with Appellees. According to Appellees, the terms in the SBL Brochure constitute the terms of the parties' contract and the Steelers breached those terms by failing to: (1) provide them with seats in the sections depicted in the two diagrams included in the SBL Brochure; (2) issue seats to them in accordance with the priority promised in the SBL Brochure; and (3) refund their deposits or reduce their future payments, as promised by the SBL Brochure, once the Steelers learned that they could not give Appellees seats in the higher priced sections they had requested. Appellees further assert that the Steelers are guilty of fraud and negligent misrepresentation by: (1) mak-

11. Mr. and Mrs. Serwonski were each granted one SBL and Mr. Carmassi was granted two SBLs.

12. According to the Serwonskis and Mr. Carmassi, Section D should have included the first twelve rows because the SBL Brochure upper level diagram depicted the three sections on that level as being equal in size and the upper level contains 36 rows.

13. Appellees commenced their action by filing a complaint, but subsequently filed three amended complaints. We consider Appellees' Third Amended Complaint here.

ing false assurances both in the SBL Brochure and on "the Steeler web page" that they "would honor requests for specified SBL Sections, or reduce the purchase price if the highest priced Section selected was unavailable . . . ."; and (2) awarding SBL applicants seats in certain sections when the Steelers knew that such seats were not available. R.R. at 93a–94a. Appellees also contend that the Steelers violated the Unfair Trade Practices and Consumer Protection Law (the "UTPCPL"), 73 P.S. § 201–1 *et seq.,*[14] by essentially making false representations regarding the sale of SBLs.

Besides monetary damages, Appellees also request a declaratory judgment stating that: (1) the SBL Agreement, including the integration clause in the Additional Terms document, is void for want of consideration; or (2) the terms of the SBL Brochure, including the two diagrams in the Brochure, must be integrated within the SBL Agreement to define and describe the location of the section assignments referred to in the SBL Agreement. *See* R.R. 96a–98a. Furthermore, Appellees seek an injunction requiring that: (1) "all seat licenses and all season tickets be reissued in accordance with the agreed upon priority;" or (2) the SBL Agreements entered into by Appellees be rescinded and Appellees be awarded "full restitution of all money paid, plus interest, and attorneys' fees." R.R. 92a–93a.

In response to Appellees' complaint, the Steelers filed preliminary objections in which they essentially alleged that all of Appellees' claims must be dismissed because they failed as a matter of law.[15] On November 20, 2001, the trial court held a hearing regarding the Steelers' preliminary objections and

**14.** Act of December 17, 1968, P.L. 1224, No. 387.

**15.** In addition to arguing that Appellees' claims failed as a matter of law, Appellant the Sports & Exhibition Authority of Pittsburgh and Allegheny County ("SEA") also filed separate preliminary objections in which it argued that it was immune from liability for negligent misrepresentation, fraud, and violation of the UTPCPL on the basis of the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S. §§ 8541 *et seq.* Appellees subsequently conceded that SEA was indeed immune from any such liability. *See* Second Proposed Order attached to Plaintiff's Brf. in Opposition to Defendants' Preliminary Objections; *see also* Appellees' Commw. Ct. Reply Brf., at 10.

approximately one month later, on December 28, 2001, it entered an order and opinion sustaining the Steelers' preliminary objections and dismissing Appellees' complaint. In its opinion, the trial court initially pointed out that because the SBL Agreement was a fully integrated agreement that represented all of the terms of the parties' agreement, it superseded all of the parties' previous negotiations and agreements, including the terms in the SBL Brochure. The court then explained that Appellees' breach of contract claims failed as a matter of law because they were solely based on the terms in the SBL Brochure and the parol evidence rule prohibited evidence of those terms from being used to alter the plain terms of the SBL Agreement.

Next, the trial court sustained the Steelers' preliminary objections to Appellees' claims of fraud and negligent misrepresentation, finding that because these claims were directly based on the parties' contractual agreement, they could only be brought as part of Appellees' breach of contract claims rather than as separate tort claims.[16] *See* Tr. Ct. Op. at 12 (" 'To permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of action.' ") (quoting *Bash v. Bell Telephone Co.,* 411 Pa.Super. 347, 601 A.2d 825 (1992)). The trial court also found that Appellees' claims that the Steelers had violated the UTPCPL failed as a matter of law because private causes of action under the UTPCPL may only be brought based on the sale of goods or services and SBLs are neither goods nor services.[17] The trial court further noted that even if the UTPCPL applied to SBLs, Appellees' claims would fail because Appellees had to establish that they relied on the

**16.** The trial court also found that Appellees' claims that the Steelers misled them about the location of their seats based on the SBL Brochure diagrams had no basis as the diagrams did not even include "any numbering of seats or any location of rows of seats." Tr. Ct. Op., at 12.

**17.** Section 201–9.2 of the UTPCPL, which provides for private causes of action under the UTPCPL, only applies to a "person who purchases or leases goods or services primarily for personal, family or household purposes...." 73 P.S. § 201–9.2.

representations in the SBL Brochure to prevail on those claims and Appellees could not prove that they had relied on those representations given that they had signed the SBL Agreement which specifically superseded the representations in the SBL Brochure.

The trial court also determined that Appellees were not entitled to declaratory relief. Specifically, the court found that the SBL Agreement could not be declared void for want of consideration because the parties explicitly agreed in the SBL Agreement to be legally bound by that Agreement and the Pennsylvania Uniform Written Obligations Act, 33 P.S. §§ 1 *et seq.*,[18] makes clear that a written agreement shall not be void for lack of consideration if it contains an express statement "that the signer intends to be legally bound" by it.[19] 33 P.S. § 6. The court further found that the terms in the SBL Brochure could not be integrated into the SBL Agreement to define and describe the sections assigned to Appellees because the SBL Agreement included a copy of the document containing the August 1999 Diagrams to define and describe the section locations. Moreover, the court explained that "[i]t is simply not logical to believe that a sketch of the seating areas of the Stadium published almost two years before the Stadium was built [*i.e.*, the SBL Brochure diagrams] was included in the final contract of the parties [*i.e.*, the SBL Agreement], particularly when a diagram [*i.e.*, the August 1999 Diagrams] was included with the contract." Tr. Ct. Op. at 7. Lastly, with regard to Appellees' claim for injunctive relief, the trial court concluded that such relief was not warranted as Appellees "have failed to allege any irreversible harm that will occur in the absence of an injunction and have failed to plead a clear right to such relief." *Id.* at 11.

18. Act of May 13, 1927, P.L. 985, No. 475.

19. The last paragraph of the SBL Agreement states:
*Binding Effect.* This Agreement shall be binding upon and inure to the benefit of the parties hereto and their permitted successors and assigns. . . .
R.R. 159a.

Appellees appealed from the trial court's decision to the Commonwealth Court. On August 28, 2002, the Commonwealth Court entered an order affirming the trial court's dismissal of Appellees' fraud and negligent misrepresentation claims and injunctive relief claim,[20] but reversing the trial court's dismissal of Appellees' claims for breach of contract, violation of the UTPCPL, and declaratory relief. With respect to Appellees' breach of contract claim, the Commonwealth Court found that the terms in the SBL Brochure constituted the terms of the parties' contract.[21] Therefore, the court determined that the parol evidence rule did not preclude review of Appellees' claims concerning the SBL Brochure terms, and the trial court improperly granted a demurrer on Appellees' breach of contract claim for that reason.[22] In

**20.** The Commonwealth Court agreed with the trial court that Appellees' claims for fraud and negligent misrepresentation were improper because they were based primarily on the parties' contract. *See Yocca v. Pittsburgh Steelers Sports, Inc.,* 806 A.2d 936, 946 (Pa.Commw.2002). The Commonwealth Court also determined that injunctive relief was unwarranted because Appellees could be adequately compensated by money damages. *Id.*

**21.** The Commonwealth Court explained that "[a] contract is formed when there is an offer, an acceptance of that offer and an exchange of consideration." *Yocca,* 806 A.2d at 942 (citing *Hartman v. Baker,* 766 A.2d 347 (Pa.Super.2000)). The court then found that: (1) the Steelers made an offer to Appellees when they sent them the SBL Brochure; (2) Appellees accepted the Steelers' offer when they returned the application included with the Brochure; and (3) the non-refundable one-third deposit paid by Appellees constituted an exchange of consideration. *See id.* ("Because [Appellees] had remitted the first one-third of their payment for the SBLs, and because they could not get that money back, the contract was complete at that point."). Accordingly, the court concluded that a contract was fully formed when Appellees submitted their applications with the required deposit and that the SBL Brochure therefore constituted the terms of the parties' contract.

**22.** The court recognized that there was an issue regarding whether the SBL Agreement superseded the earlier contract terms in the SBL Brochure. However, the court ultimately concluded that the issue was not completely clear and that a demurrer was therefore improper at the preliminary objections stage. Moreover, with respect to this issue, the court seemed to find merit in Appellees' claim that "the SBL Agreement and Additional Terms, mailed out after the contract had been formed, contained unilateral, unbargained-for changes to the terms of the contract that cannot be overcome by including an integration clause." *Yocca,* 806 A.2d at 943.

considering Appellees' UTPCPL claim, the Commonwealth Court determined that the Steelers' sale of SBLs constituted a sale of an option contract, *i.e.,* a contract to keep an offer open,[23] and that an option contract could conceivably be a "service" for purposes of the UTPCPL. *See Yocca,* 806 A.2d at 947 ("[W]e cannot say with certainty that the option contracts here cannot be considered a 'service' as under the UTPCPL."). Thus, the court concluded that "the trial court's dismissal of [Appellees'] action under the UTPCPL was improper at [the] preliminary objection stage." *Id.* Lastly, the Commonwealth Court found that the trial court had improperly dismissed Appellees' secondary claim for declaratory relief because "the law does not state with certainty" that Appellees are not entitled to a declaratory judgment stating that the terms of the SBL Brochure must be integrated within the SBL Agreement to define and describe the section locations referred to in the SBL Agreement.[24] *Id.* at 945.

Judge Cohn filed a concurring and dissenting opinion, in which she agreed with the majority's decision to affirm the trial court's dismissal of Appellees' fraud and misrepresentation claims and claim for injunctive relief, but disagreed with the majority's decision to reinstate Appellees' remaining claims. According to Judge Cohn, the terms in the SBL Brochure were not part of the parties' contract because those terms did not promise Appellees anything.[25] Judge Cohn

**23.** The court explained that the SBLs granted Appellees "the right to buy season tickets in a certain Section of the stadium for as many consecutive seasons as they wish. In other words, by purchasing SBLs, [Appellees] paid [the Steelers] to keep open an offer to sell them season tickets...." *Yocca,* 806 A.2d at 947.

**24.** The Commonwealth Court agreed with the trial court that Appellees were not entitled to a declaratory judgment stating that the SBL Agreement was void for lack of consideration because the Agreement explicitly stated that the parties had agreed to be legally bound by it and such a statement made the SBL Agreement enforceable without consideration. *See Yocca,* 806 A.2d at 945.

**25.** Judge Cohn explained that "[a] contract requires a promise," *Yocca,* 806 A.2d at 948 (Cohn, J., concurring and dissenting) (citing *Ringgold Sch. Dist. v. Abramski,* 57 Pa.Cmwlth. 33, 426 A.2d 707 (1981)), and "[a]n expression of intention is not a promise unless it is communicated to one or more persons under such circumstances that they will expect

found that Appellees' reliance on the Brochure's terms was unreasonable as the Brochure "did nothing more than promise *to try* to seat people where they wished to be." *Yocca*, 806 A.2d at 948 (Cohn, J., dissenting) (emphasis added). Moreover, Judge Cohn noted that "since the building of the new stadium had not even begun, reliance on a general diagram that contained no clear objective components from which one could construe exactly where a section would begin and end, much less where individual seats would be, is, in my view, unreasonable reliance as a matter of law." *Id.* Therefore, based on her conclusion that the terms in the SBL Brochure could not be a part of the parties' contract, Judge Cohn explained that she would dismiss Appellees' breach of contract claims, which were wholly based on the terms in the SBL Brochure, as a matter of law.

Judge Cohn further stated that she would dismiss Appellees' claim that the Steelers violated the UTPCPL because the UTPCPL only applies to sales of goods and services, and in her view, SBLs are neither goods nor services, but rather are intangible property rights. With regard to Appellees' claim for declaratory relief, Judge Cohn explained that she did not believe that Appellees were entitled to a declaration stating that the SBL Brochure terms must be integrated into the SBL Agreement because "integrating [the Brochure terms] would not be helpful to [Appellees'] case" given her conclusion that the Brochure did not contain any promises. *Id.* at 949 (Cohn, J., concurring and dissenting).

The Steelers subsequently filed a petition for allowance of appeal with this Court, arguing that the Commonwealth Court erroneously reversed the trial court's order dismissing Appellees' claims for breach of contract, violation of the UTPCPL, and declaratory relief. On July 22, 2003, we granted the Steelers' petition.

The Steelers initially argue that the Commonwealth Court improperly reversed the trial court's order dismissing Appellees' breach of contract claims because the parol evidence rule

performance and may reasonably act in reliance upon the expression." *Id.* (citing Corbin on Contracts, § 1.15 (1993)).

bars any consideration of Appellees' claims, which are wholly based on the terms in the SBL Brochure. We agree.

 As a trial court's decision to grant or deny a demurrer involves a matter of law, our standard for reviewing that decision is plenary. *See Daniels v. Workers' Compensation Appeal Bd. (Tristate Transport)*, 574 Pa.61, 828 A.2d 1043, 1046–47 (2003). Preliminary objections in the nature of demurrers are proper when the law is clear that a plaintiff is not entitled to recovery based on the facts alleged in the complaint. *See HCB Contractors v. Liberty Place Hotel Associates*, 539 Pa. 395, 652 A.2d 1278, 1279 (1995). Moreover, when considering a motion for a demurrer, the trial court must accept as true "all well-pleaded material facts set forth in the complaint and all inferences fairly deducible from those facts." *Small v. Horn*, 554 Pa. 600, 722 A.2d 664, 668 (1998).

 This Court has explained the parol evidence rule as follows:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Gianni v. Russell & Co.*, 281 Pa. 320, 126 A. 791, 792 (1924) (citations omitted); *see also Scott v. Bryn Mawr Arms, Inc.*, 454 Pa. 304, 312 A.2d 592, 594 (1973). Therefore, for the parol evidence rule to apply, there must be a writing that represents the "entire contract between the parties." *Gianni*, 126 A. at 792. To determine whether or not a writing is the parties' entire contract, the writing must be looked at and "if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engage-

ment, it is conclusively presumed that [the writing represents] the whole engagement of the parties...." *Id.* An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution. *See HCB Contractors,* 652 A.2d at 1280; *McGuire v. Schneider,* 368 Pa.Super. 344, 534 A.2d 115, 117 (1987), *aff'd,* 368 Pa.Super. 344, 534 A.2d 115 (1988).

Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract. *See Bardwell v. Willis Co.,* 375 Pa. 503, 100 A.2d 102, 104 (1953); *McGuire,* 534 A.2d at 117–18. One exception to this general rule is that parol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake.[26] *See HCB Contractors,* 652 A.2d at 1279; *Bardwell,* 100 A.2d at 104. In addition, where a term in the parties' contract is ambiguous, "parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." *Estate of Herr,* 400 Pa. 90, 161 A.2d 32, 34 (1960); *see also Waldman v. Shoemaker,* 367 Pa. 587, 80 A.2d 776, 778 (1951).

In the instant case, we cannot agree with the Commonwealth Court that the SBL Brochure represented the terms of the parties' contract concerning the sale of SBLs. Contrary to the Commonwealth Court's understanding, the

---

**26.** Notably, while parol evidence may be introduced based on a party's claim that there was a fraud in the execution of the contract, *i.e.,* that a term was fraudulently omitted from the contract, parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.,* that an opposing party made false representations that induced the complaining party to agree to the contract. *See HCB Contractors,* 652 A.2d at 1279; *Bardwell,* 100 A.2d at 104.

SBL Brochure did not represent a promise by the Steelers to sell SBLs to Appellees. Rather, the Brochure was merely an offer by the Steelers to sell Appellees the right to be assigned an unspecified seat in an unspecified section of the new stadium and the right to receive a contract to buy an SBL for that later-assigned seat. *See* R.R. 50a ("You may *apply* for any Section you wish as your first preference. . . . [E]very application . . . will be assigned a random computerized priority number and that priority number will be used to assign both sections and seats.") (emphasis added); *see also id.* ("[Y]ou will be mailed a contract by the end of March 1999, notifying you of your Section assignment. The contract must be signed and returned within 15 days."). Moreover, by sending in their applications with the initial non-refundable payment, Appellees simply secured their right to be considered for assigned seats and the opportunity to receive a subsequent offer to purchase SBLs for those seats. In this respect, the SBL Brochure was similar to an option contract in that it merely gave Appellees the option to possibly accept an offer for SBLs at some later date. *See Warner Bros. Theatres v. Proffitt*, 329 Pa. 316, 198 A. 56, 57–58 (1938) (explaining that in an option contract, the optionee pays the seller to keep an offer of sale open until a specified later date and therefore an option contract is not a contract to buy goods, but merely contemplates a possible future contract to buy goods).

On the other hand, the SBL Agreement clearly represented the parties' contract concerning the sale of SBLs. Unlike the SBL Brochure, the SBL Agreement reflected a promise by the Steelers to actually sell Appellees a specific number of SBL seats in a specified section. Furthermore, the SBL Agreement detailed all of the terms and conditions of that sale, *i.e.*, the precise number of seats to be sold to the named Licensee, the exact section in which those seats were located (including a visual depiction of that location), the total amounts due for each SBL, the dates those amounts were due, and all of the rights and duties associated with owning an SBL, including the Licensee's right to transfer the SBL. Most importantly, the SBL Agreement explicitly stated that it

represented the parties' entire contract regarding the sale of SBLs. *See* R.R. at 58a ("This Agreement contains the entire agreement of the parties with respect to the matters provided for herein and shall supersede any representations or agreements previously made by or entered into by the parties hereto."). Accordingly, we find that the SBL Agreement represented the parties' entire contract with respect to the sale of SBLs and that the parol evidence rule bars the admission of any evidence of previous oral or written negotiations or agreements entered into between the parties concerning the sale of the SBLs, such as the SBL Brochure, to explain or vary those terms expressed in the SBL Agreement. *See Bardwell,* 100 A.2d at 104–05; *Gianni,* 126 A. at 792; *McGuire,* 534 A.2d at 117–18.

Appellees also argue, however, that even if the SBL Agreement was the parties' contract concerning the sale of SBLs, evidence of the SBL Brochure diagrams must be admitted to describe and define the seating section assignments referred to in the SBL Agreement. According to Appellees, the Agreement's reference to the section where the Licensee was assigned SBL seats was ambiguous because it simply stated the section and failed to describe where that section was located in the stadium. Contrary to Appellees' claims, however, the Agreement was not the least bit ambiguous with regard to the location of Appellees' section assignments as the Agreement specifically referenced the attached August 1999 Diagrams, which depicted all of the section locations. As a result, there was no need to look outside of the SBL Agreement to ascertain where a section was located in the stadium. *See Scott,* 312 A.2d at 597 n. 2.

Having determined that the SBL Agreement was the parties' whole contract and cannot be supplemented by the parties' previous negotiations or agreements, including the SBL Brochure, we agree with the trial court's conclusion that Appellees' breach of contract claims must be dismissed. As noted previously, Appellees' breach of contract claims are entirely based on allegations that the Steelers violated the

terms and conditions set forth in the SBL Brochure. Therefore, because those terms and conditions are not, in fact, part of the parties' contract, Appellees' breach of contract claims fail to state a claim upon which relief may be granted.

We further conclude that the trial court properly dismissed Appellees' claim that the Steelers violated the UTPCPL because the allegations in Appellees' complaint fail to establish that they are entitled to relief on that claim. As is clear from the lower courts' discussion and findings with respect to this claim, the law is not completely settled as to whether an SBL constitutes either a good or a service. *See* Tr. Ct. Op., at 14–15 (finding that SBL is not a good); *Yocca,* 806 A.2d at 936 (finding that SBL is an option contract and thus, potentially a type of service covered by UTPCPL); *see also id.* at 949–50 (finding that an SBL is intangible property and thus, neither a good nor a service) (Cohn, J., concurring and dissenting). Nevertheless, Appellees have failed to state a UTPCPL claim upon which relief can be granted regardless of whether an SBL constitutes a good or a service.

To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance. *See Weinberg v. Sun Co.,* 565 Pa. 612, 777 A.2d 442, 446 (2001); *see also Debbs v. Chrysler Corp.,* 810 A.2d 137, 156–57 (Pa.Super.2002); *Sexton v. PNC Bank,* 792 A.2d 602, 607 (Pa.Super.2002). Appellees' UTPCPL claims, like all of the other claims in their complaint, are premised on the representations made by the Steelers before the parties entered into the SBL Agreement, particularly, the representations made in the SBL Brochure. According to Appellees, they are entitled to relief because they justifiably relied on these representations in deciding to purchase their SBLs and they suffered damages as a result of that reliance.[27] However, given this Commonwealth's adop

27. Appellees do not specifically allege justifiable reliance in the paragraphs of their complaint that comprise their UTPCPL count. However, that count incorporates by reference all of Appellees previous allegations in their complaint and the prior count of fraud and negli-

tion of the parol evidence rule, Appellees simply cannot be said to have *justifiably* relied on any representations made by the Steelers before the parties entered into the SBL Agreement. Indeed, by signing the SBL Agreement, which contained an integration clause stating that the terms of the SBL Agreement superceded all of the parties' previous representations and agreements, Appellees explicitly disclaimed reliance on any such representations. *See Gianni*, 126 A. at 792; *see also Blumenstock v. Gibson*, 811 A.2d 1029, 1035–36 (Pa.Super.2002) ("a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations"); *Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 654 (W.D.Pa. 1999) ("As a matter of basic logic, [plaintiff] cannot be said to have relied upon representations specifically excluded by the integration clause."). Accordingly, as any reliance on the SBL Brochure or any other representation preceding the SBL Agreement was *not* justifiable, Appellees' allegations in their complaint fail to establish that they are entitled to relief under the UTPCPL and the trial court did not err in dismissing Appellees' UTPCPL claims for failing to state a claim.

Finally, Appellees are also not entitled to relief with respect to their request for a declaratory judgment stating that the terms of the SBL Brochure must be integrated within the SBL Agreement to define and describe the section assignments referred to in the SBL Agreement. As noted above, the SBL Agreement properly defined and described the section assignments it referred to by attaching the August 1999 Diagrams. Therefore, contrary to Appellees' contentions, the SBL Agreement was not ambiguous when it referred to Appellees' section assignments, and the terms of the SBL Brochure, including its two diagrams, are not necessary to clarify those section references.

Accordingly, we reverse the Commonwealth Court's order reversing the trial court's order dismissing Appellees' claims

gent misrepresentation does include an allegation that Appellees justifiably relied on the representations made by the Steelers before the parties entered into the SBL Agreement.