J-A27021-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  ESTATE OF DAVID ROY BITTNER, A/K/A DAVID R. BITTNER, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  CHASITY L. BITTNER, INDIVIDUALLY AND AS THE SURVIVING PARENT AND NATURAL GUARDIAN OF PRESTON MARSHALL BITTNER | No. 1847 WDA 2014 |

Appeal from the Order Entered September 17, 2014
In the Court of Common Pleas of Bedford County
Orphans' Division at No(s): 74 for 2013

BEFORE:  BOWES, OLSON & STABILE, JJ.

MEMORANDUM BY OLSON, J.:                FILED: January 21, 2016

Appellant, Chasity Bittner, individually and as the surviving parent and natural guardian of Preston Marshall Bittner, appeals from the order entered on September 17, 2014, as made final by the denial of Appellant's exceptions on October 8, 2014.  We affirm.

> The Orphans' Court ably explained the underlying facts of this case.
>
> David Bittner died testate on December 31, 2011.  Under his will, [Appellant (and her son)] were each beneficiaries of 25% of the residual estate.  David Bittner's residual estate includes 12 shares of stock in Snyder's Gateway and 14 shares of stock in Breezewood Enterprises, both of which [constitute minority interests in] closely-held family entities.  The valuation of this stock is the sole issue in the matter. . . .
>
> Co-executors M&T Bank and Robert Bittner (hereinafter "Executors") applied discounts for lack of marketability and minority interests to the stock, listing their combined value at $719,059[.00] in the First and Final Account.  [Appellant] filed objections to the First and Final Account, specifically to the valuation of the stock.  [Appellant] argue[d] that the

plain language of [the Amended and Restated Stock Restriction, Transfer and Purchase Agreement (hereinafter "the Shareholder Agreement") for both companies mandates that no discounts should have been applied, that the value should have been calculated on a *pro rata* basis[,] and that, as a result, the Executors breached their fiduciary duty. . . .

Orphans' Court Opinion, 9/17/14, at 1-2.

The relevant portions of the Shareholder Agreement declare:

**§ 2.05** **Death of a Shareholder.** Upon the death of a Shareholder, each Issuing Company shall have the option to purchase all, but not less than all, of such deceased Shareholder's Common Stock at a price equal to the Fair Market Value of such Common Stock as determined under § 2.11. Likewise, upon the death of a Shareholder, the personal representative of such deceased Shareholder's estate shall have the right to require each Issuing Company to purchase all of the deceased Shareholder's Common Stock at a price equal to the Fair Market Value of such Common Stock as determined under § 2.11. Either such option shall be exercised, if at all, within nine (9) months of the date of such deceased Shareholder's death, in writing delivered, in the case of the exercise of the Issuing Company's option, to the personal representative, to the Issuing Company. Notwithstanding the foregoing provisions of this § 2.05, upon the death of David R. Bittner, the Issuing Company shall redeem all, but not less than all, of the Common Stock held by David R. Bittner at the time of his death as soon as such redemption is lawful and not in violation of any agreement by which the Issuing Company is bound.

. . .

**§ 2.11 Fair Market Value.** As used herein, the term "Fair Market Value" of the Common Stock being transferred hereunder shall mean that amount determined by the Shareholders to be the per share fair market value of the Company issuing such Common Stock (the "Issuing Company") for the calendar year of the transfer, multiplied by the number of shares of Common Stock being

transferred. In the absence of a determination by the Shareholders of the per share fair market value of an Issuing Company for the calendar year of any transfer, the "Fair Market Value" of the Common Stock being transferred during such calendar year shall be the per share fair market value of such Company, as determined by the certified public accountant employed by the Company for the preparation of its immediately preceding annual financial statements and income tax returns, multiplied by the number of shares being transferred.

The Shareholder Agreement, dated 8/16/10, at §§ 2.05 and 2.11.

On June 4, 2014, the parties appeared for a hearing on Appellant's objections to the First and Final Account. At the beginning of the hearing, Appellant claimed that a hearing was unnecessary in this case because the Shareholder Agreement was unambiguous. N.T. Hearing, 6/4/14, at 7. As the Orphans' Court explained, Appellant claimed that the plain language of the above provisions declared that, in calculating the fair market value of the stock, "no discounts should have been applied, [] the value should have been calculated on a *pro rata* basis[,] and [], as a result, the Executors breached their fiduciary duty." Orphans' Court Opinion, 9/17/14, at 2; *see also* N.T. Hearing, 6/4/14, at 7-29.

The Executors, on the other hand, claimed that a hearing was necessary because Section 2.11 of the Shareholder Agreement was ambiguous. N.T. Hearing, 6/4/14, at 14-15. Therefore, the Executors claimed, parol evidence was needed to determine how the shares were to be valued under the agreement. *Id.*

The Orphans' Court deferred ruling on the issue of whether the Shareholder Agreement was ambiguous. *Id.* at 25-26. The Orphans' Court then heard testimony on the case.

During the hearing, Appellant produced no evidence and instead relied upon her claim that the Shareholder Agreement was unambiguous. The Executors produced both lay and expert witnesses at the hearing, and their evidence included the following:

- John Campbell, the "Administrative Vice President and Regional Manager for the Fiduciary team for Central Western and Northern PA for Wilmington Trust which is an M&T Company," testified that "discounts for lack of marketability and lack of control when there's a calculation of fair market value" of minority shares in a closely-held corporation are "always" a "component of developing the fair market value" of the shares. N.T. Hearing, 6/4/14, at 71-72;

- Joshua Lefcowitz, a certified public accountant who was "hired by Snyder's [] Gateway and Breezewood Enterprises to perform valuation in connection with this estate" testified that: "[t]he term used in Section 2.11 is fair market value[,] which is a well-defined term within the business valuation community" and "[w]hen you're valuing a minority interest in a closely-held business as [here, the term includes] adjustments for the lack of control and lack of marketability that exists with that non-controlling ownership interest;" "the term 'per share fair market value' equates to the fair market value of the

equity interest being valued;" "discounts for lack of control and lack of marketability are inherent in the fair market value concept" for minority interests in closely-held corporations; the business valuation company that was hired to perform the valuation in this case also performed a prior valuation for both Snyder's Gateway and Breezewood Enterprises – and, during the prior valuation, the company adjusted the value for lack of control and lack of marketability, and none of the shareholders objected to the manner of valuation; and, it would be nonsensical if "fair market value" did not include the discounts for lack of control and lack of marketability because, if the discounts were not included in the definition, the corporations would be forced to buy the shares back at a price that was higher than fair market value; *id.* at 92, 103, 104, and 109; and,

- John Bittner, who was another signatory to the Shareholder Agreement, testified that it was not "[his] intent in using the term 'fair market value' . . . that [he] would just take the total company's value and then just distribute the *pro rata* portion of it;" *id.* at 229.

Within the Orphans' Court's later filed opinion, the Orphans' Court concluded that the term "Fair Market Value" in the Shareholder Agreement was ambiguous. Orphans' Court Opinion, 9/17/14, at 3. Specifically, Section 2.11 mandated that the value of the shares be determined by the "per share fair market value of such Company . . . multiplied by the number of shares being transferred." The Shareholder Agreement, dated 8/16/10,

at § 2.11. Yet, as the Orphans' Court explained, this language supported two reasonable interpretations:

> one reasonable interpretation would be to calculate the total fair market value of the entire company first and then simply divide by the number of shares. Of course, this interpretation assumes that "fair market value" specifically refers to the "Company," which is [the interpretation] advanced by [Appellant]. However, . . . an equally reasonable interpretation would be to assess the fair market value of the shares themselves – including an analysis of the specific shares to be transferred – and computing the value of the number of shares transferred. In contrast to the former, this interpretation assumes that "fair market value" refers to the shares themselves rather than the company as a whole, which is [] the approach applied by the Executors.

*Id.* at 4.

Given the above ambiguity, the Orphans' Court concluded that parol evidence was necessary to interpret the agreement. *Id.* The Orphans' Court then determined that, under the agreement, the parties intended for the calculation of the subject shares to include discounts for lack of marketability and lack of control. *Id.* at 6-7. Thus, the Orphans' Court denied Appellant's objections to the First and Final Account, confirmed the accounting, and ordered that distribution occur in accordance with the Executors' petition. Orphans' Court Order, 9/17/14, at 1.

Appellant filed timely exceptions to the final order, and these exceptions were denied. Appellant then filed a timely notice of appeal. Now on appeal, Appellant raises the following claims:

1. Did the [Orphans'] Court err in admitting testimony regarding the interpretation of the stock purchase agreement?

2. Did the [Orphans'] Court err in determining that M&T Bank, the corporate fiduciary, was held to the "prudent man standard" when in fact corporate fiduciaries are held to the "greater skill standard" as set forth in *In re Estate of Killey*, 326 A.2d 372 (Pa. 1974)?

3. Did the [Orphans'] Court err in failing to properly construe the plain meaning of "fair market value" defined in Section 2.11 Fair Market Value of the Stock Purchase Agreement?

4. Did the [Orphans'] Court err in failing to use $1,082,434.00 [*pro rata*] valuations for the 12 shares of Snyders and the 14 shares of Breezewood?

5. Assuming for purposes of argument that discounts are applied to the decedent's common stock to be transferred pursuant to § 2.11, the [Orphans'] Court erred in failing to hold that the provisions of the last sentence of the first paragraph of § 2.05 render moot the first three sentences of that paragraph.

Appellants' Brief at 4 (some internal capitalization, italics, and underlining omitted).

We reviewed the briefs of the parties, the relevant law, the certified record, and the well-written and thorough opinion from the able Orphans' Court judge, the Honorable Travis W. Livengood. We conclude that the claims raised in Appellant's brief fail and that Judge Livengood's opinion, filed on September 17, 2014, meticulously and accurately explains why Appellant's claims fail. Therefore, we adopt the Orphans' Court's opinion as our own. In any future filings with this or any other court addressing this ruling, the filing party shall attach a copy of the Orphans' Court's opinion.

- 7 -

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/21/2016

IN THE COURT OF COMMON PLEAS OF BEDFORD COUNTY, PENNSYLVANIA

IN RE: ESTATE OF DAVID R. BITTNER

NO: 74 FOR 2013

ORPHANS DIVISION

## MEMORANDUM OPINION

### I. SUMMARY OF CASE

David Bittner died testate on December 31, 2011. Under his will, his widow Chasity Bittner and his son Preston Bittner, were each beneficiaries of 25% of the residual estate. David Bittner's residual estate includes 12 shares of stock in Snyder's Gateway and 14 shares of stock in Breezewood Enterprises, both of which are closely-held family entities. The valuation of this stock is the sole issue in the matter. Co-executors M & T Bank and Robert Bittner (hereinafter "Executors") applied discounts for lack of marketability and minority interests to the stock, listing their combined value at $719,059 in the *First and Final Account*. Chasity Bittner and Preston Bittner (hereinafter "Objectors") filed objections to the *First and Final Account*, specifically to the valuation of the stock. The Objectors argue that the plain language of the Shareholder Agreement for both companies mandates that no discounts should have been applied, that the value should have been calculated on a *pro rata* basis and that, as a result, the

1

Executors breached their fiduciary duty. We disagree with Objectors and overrule their objections entirely.[1]

## II. LEGAL STANDARD

"[The] standard of care imposed upon the executor has been repeatedly expressed as 'that which a man of ordinary prudence would practice in the care of his own estate.'" "Parties seeking surcharge bear the burden of proving the executor failed to meet the duty of care owed to the estate." *In re Dobson's Estate*, 417 A.2d 138, 142 (Pa. 1980) citing *Estate of McCrea*, 380 A.2d 773, 775-76 (Pa. 1977) and *Estate of Lux*, 389 A.2d 1053 (Pa. 1978).

## III. DISCUSSION

## III(A). INTRODUCTION

Given the applicable standard, the burden is upon the Objectors to show by a preponderance of the evidence that the Executors breached their fiduciary duty. We first note that Objectors chose not to present any witnesses during the evidentiary hearing. Rather, Objectors argue that the plain language of the David Bittner's will and the Shareholder's Agreement—without more—are enough to flip the burden of proof onto the Executors. We disagree.

---

[1] We find significant merit to the Executors' *Motion for Directed Verdict* given Objectors' failure to produce any testimony or evidence, relying solely upon the language in the Shareholder Agreement. We did not specifically grant said motion only because we believed it necessary to discuss the merits of the testimony produced by Executors in order to rule upon the objections.

2

42

### III(B). INTEGRATION CLAUSE

We first address Objector's argument regarding the integration clause of the Shareholder Agreement. "Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract." *Yucca v. Pittsburgh Steelers Sports, Inc.,* 854 A.2d 425, 436-37 (Pa. 2004). However, "...where a term in the parties' contract is ambiguous, 'parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.'" *Id.* quoting *Estate of Herr,* 161 A.2d 32, 34 (Pa. 1960). Upon careful review of the Shareholder Agreement, we find the language—particularly Section 2.11—to be inherently ambiguous. Section 2.11 reads, in relevant part:

> "In the absence of a determination by the Shareholders of the per share fair market value of an Issuing Company for the calendar year of any transfer, the "Fair Market Value" of the Common Stock being transferred during such calendar year *shall be the per share fair market value of such Company,* as determined by the certified public accountant employed by the Company for the preparation of its immediately preceding annual financial statements and income tax returns, *multiplied by the number of shares being transferred.*"

Exhibit 3 (emphasis added). There is no dispute that Breezewood Enterprises and Snyder's Gateway are closely-held, private, family companies. There is also no dispute that the stock transferred upon David Bittner's death were minority interests in both

3

43

companies. It is for these very facts that we find the above language in Section 2.11 ambiguous, subject to different interpretations. That is, one reasonable interpretation would be to calculate the total fair market value of the entire company first and then simply divide by the number of shares. Of course, this interpretation assumes that "fair market value" specifically refers to the "Company," which is essentially advanced by Objectors.[2] However, we believe an equally reasonable interpretation would be to assess the fair market value of the shares themselves—including an analysis of the specific shares to be transferred—and computing the value of the number of shares transferred. In contrast to the former, this interpretation assumes that "fair market value" refers to the shares themselves rather than the company as a whole, which is essentially the approach applied by the Executors. Inasmuch as we find that at least two reasonable interpretations to the language of the Shareholder Agreement exist, we find an inherent ambiguity exists. Accordingly, we shall consider the parol evidence offered by Executors regarding the Shareholder Agreement.

### III(C). PAROL EVIDENCE AND FINDINGS OF FACT

---

[2] We do note that, while Objectors' interpretation may be "reasonable" in theory, we do not find it *feasible* given the circumstances of the companies involved. Since both companies are private companies, closely-held by family members, we find it would be impossible to assess a true fair market value of the entire companies without evaluating the number of shares transferred and the makeup of the remaining shareholders. Therefore, while we find some basis in the language for Objectors' interpretation of Section 2.11 for the purposes of this particular discussion on parol evidence, we find Executors' interpretation to be substantially better grounded in the foundation of the language of the Shareholder Agreement and exponentially more practical in execution.

4

John Bittner, David Bittner's brother, is a shareholder in both Snyder's Gateway and Breezewood Enterprises and a signatory party to the Shareholder Agreement. John Bittner testified that it was never his intention for Section 2.11 to require a *pro rata* valuation of shares. Rather, he testified that the purpose of the Shareholder Agreement was for family shareholders to retain the value of the company should a shareholder leave the companies or predecease the other shareholders. According to John Bittner, additions to the Shareholder Agreement were made specifically to provide for David Bittner's young children shortly after David was diagnosed with a terminal health condition. We find John Bittner to be a credible witness and accept the above testimony as fact in our discussion. The Executors also called John Dibert, a former Chief of the Pennsylvania Department of Revenue. Mr. Dibert testified that, in his opinion, Section 2.11 should be interpreted to value the shares of David Bittner as if the shares would be transferred between a willing seller and willing buyer. Mr. Dibert testified that, in such an evaluation, he would expect to see a discount for lack of control and lack of marketability since David Bittner's shares were a non-controlling amount. We find Mr. Dibert's testimony credible and his opinion persuasive.

### III(D). APPLICATION OF PAROL EVIDENCE TO SECTION 2.11

According to Section 2.05 of the Shareholder Agreement, the remaining shareholders reserved the option to purchase all of David Bittner's stock in the two companies upon his death, which they did. The valuation of the stock in this re-

5

45

purchase was to be determined by Section 2.11 of the Shareholder Agreement, which is the key language at issue. Objectors argue that a "patent error" was committed by the Executors in applying discounts into the valuation of the stock. Specifically, Objectors argue that Section 2.11 requires a *pro rata* valuation, by simply dividing the total worth of the company and dividing that value by the number of shares.

In support of this argument, Objectors cite to various case precedent.[3] Unfortunately for Objectors, we find that the guidance in said precedent is actually detrimental to Objector's position, given our consideration of the Shareholder Agreement and the above-referenced testimony.

First, we find that the Executors' interpretation of Section 2.11 is the only one which affords reasonable consideration and gives effect to the Shareholder Agreement as a whole. Objectors' argument that a strict *pro rata* value is required under Section 2.11, defined as "...the total value of each Company divided by the total number of shares," completely ignores the multiple references to "fair market value" in the Shareholder Agreement. Objectors' interpretation of the Shareholder Agreement would essentially nullify every reference to "fair market value" contained in Sections

---

[3] Objectors cite to *Harrity v. Continental-Equitable Title & Trust Co.*, 124 A. 493, 494 (Pa. 1924) for the proposition that "...in construing a contract each and every part of it must be taken into consideration and given effect if possible, and that the intention of the parties must be ascertained from the entire instrument." Objectors also cite to *Lesko v. Frankford Hospital-Bucks County*, 15 A.3d 337, 342 (Pa. 2011) for the legal premise that "...[t]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties."

2.05 and 2.11. While we do recognize that Executors' interpretation of Section 2.11 renders the method of calculation[4] as surplusage, it does not gut the clear and essential mandate that the stock be assessed at "fair market value" as does Objectors' interpretation.[5]

Second, in assessing the intention of the parties, the only testimony presented overwhelmingly supports the Executors' position. The credible testimony of John Bittner, a contracting party to the Shareholder Agreement, which is bolstered by the other witnesses and evidence presented, clearly demonstrates that the intent of the parties was to evaluate the transferred stock at fair market value—including applicable discounts. We therefore find that the interpretation of Section 2.11 employed by the Executors gives the most effect to the intention of the contracting parties to the Shareholder Agreement.

We disagree with Objectors' interpretation of the Shareholder Agreement and, having not produced any other evidence in support of their position, Objectors have failed to meet their burden in demonstrating a breach of fiduciary duty by Executors. Inasmuch as we have found that Executors' interpretation of the Shareholder

---

[4] That is, the language of Section 2.11 that the per share value be calculated, then multiplied by the number of shares being transferred.

[5] Objectors also secondarily argue that the transfer under Section 2.05 is a "mandated" sale due to David Bittner's death and that fair market value analysis cannot be applied to a forced transaction. As with Objectors' primary argument, such an interpretation of the Shareholder Agreement would render multiple references to "fair market value" as useless, and is directly contradicted by the plain language of the document.

Agreement to give the most effect to the entire contract as the contracting parties' intended, we therefore find that the valuation of David Bittner's shares of stock in the two companies in the *First and Final Account* to be reasonable and proper.

We therefore enter the following

### IV. ORDER OF COURT

AND NOW, this 17th day of September, 2014, the Order of Court is as follows:

1. Executors' *Motion for Directed Verdict* is denied.

2. Objectors' objections to the *First and Final Account* are denied in their entirety.

3. Executors' *First and Final Account* is confirmed and distribution is Ordered in accordance with the terms of Executors' *Petition for Adjudication*.

BY THE COURT

_____
LIVENGOOD, J.

Counsel:
For the Executors:       R. Michael Daniel, Esquire
                         Kevin Harkins, Esquire
                         Mario Santilli, Jr., Esquire
For the Objectors:       Robert Rea, Esquire
For Additional Parties:  Brandi Hershey, Esquire
                         Michael Sahlaney, Esquire

8

48