NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1327
_____

PHILADELPHIA WORKFORCE DEVELOPMENT CORPORATION

v.

KRA CORPORATION,
                                    Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-09-cv-05261)
District Judge:  Hon. Wendy Beetlestone
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
November 3, 2016

Before:   JORDAN, GREENAWAY, JR., and RENDELL, *Circuit Judges*.

(Filed: December 13, 2016)
_____

OPINION*
_____

JORDAN, *Circuit Judge*.

    This appeal involves a contract dispute between KRA Corporation, a for-profit

workforce development services management company, and Philadelphia Workforce

_____

    * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7,
does not constitute binding precedent.

Development Corporation ("PWDC"), a non-profit entity responsible for overseeing federal and state programs to help unemployed or underemployed Philadelphians develop job skills. PWDC contracted with KRA for the latter to manage some of those programs. After an audit by the Commonwealth of Pennsylvania found that PWDC had overpaid KRA by over two million dollars, PWDC refused to pay KRA for certain invoiced but not-yet-paid work. PWDC sued to recover the money that it claims it overpaid KRA, while KRA sought to compel PWDC to pay the money it claims is still owed.

KRA argues that the contract allowed it to keep as profit all of the payments it received upon meeting certain performance benchmarks, regardless of how much money it expended to administer the programs. PWDC urges, to the contrary, that the contract cabins profit and requires KRA to return most of the revenue that exceeded expenditures. The District Court determined that the contract was ambiguous and left interpretation of it to the jury. The jury returned a verdict for PWDC.

On appeal, KRA challenges the determination that the contract was ambiguous. It also takes issue with several evidentiary rulings, and contends that there was insufficient evidence to support PWDC's decision to withhold payments for certain indirect costs incurred by KRA. We conclude that the contract was ambiguous, that none of the evidentiary rulings amount to reversible error, and that the evidence was sufficient to allow the jury to accept PWDC's indirect cost calculations. We will therefore affirm.

I.    BACKGROUND

A.    Factual Background

PWDC acts as the fiscal agent for the City of Philadelphia in administering services for the unemployed or underemployed,[1] including a variety of workforce development and skills training programs. In 2005, PWDC began contracting with both for-profit and non-profit organizations to provide personalized career guidance to city residents and to operate Employment Advancement and Retention Network Centers ("EARN Centers") where Philadelphians can receive assistance in finding and retaining employment.

In such a contract entered in 2007, KRA agreed to operate two EARN Centers for the 2008 fiscal year.[2] The first was in Germantown and the second in West Philadelphia on or near Delancey Street. During FY 2009, KRA continued to operate the two centers and also began offering Job Specific Skills Training ("JSST") programs for dental assistants and phlebotomists at the Delancey location.

PWDC utilized three types of contracts to govern its relationship with contractors like KRA. The first was a cost-reimbursement model in which the contractor was reimbursed for direct and indirect costs, including profit categorized as an administrative expense. The second provided for performance-based payments requiring a contractor to

---

[1] In 2012, PWDC merged with another entity, the Philadelphia Workforce Investment Board to form a new entity, Philadelphia Works, Inc. That merger does not impact this appeal.

[2] Fiscal Years run from July 1 of one year through June 30 of the next.

meet certain benchmarks before being paid. The third type of contract, the one that governed the relationship between PWDC and KRA, was a hybrid that featured both cost-reimbursement and performance-based payments. Under hybrid contracts in 2008 and 2009, KRA was immediately reimbursed an amount up to a fixed percentage of the cost to run each center. It was also fully reimbursed for money expended on direct client services. KRA received additional payments as it achieved predetermined performance benchmarks.

During FY 2008, the relationship proceeded according to the terms of the contract. KRA ran the EARN centers, invoiced PWDC, and received payment in a timely fashion. It is undisputed that KRA met its performance benchmarks. But the relationship changed when, in May of 2009, pursuant to the terms of the contract, the Bureau of Financial Operations of the Commonwealth of Pennsylvania audited PWDC's payments to KRA. The Commonwealth concluded that KRA had inflated its reported expenses and therefore had been paid 2.2 million dollars ($2,219,060) more than it was owed. Consequently, in June 2009, PWDC suspended payments to KRA and launched an internal audit of pending invoices. The internal audit concluded that 1.9 million dollars ($1,932,991.08) of invoiced payments should not be paid. Of particular relevance to this appeal, the audit found that KRA failed to properly document administrative costs.

Because of a budget impasse in Pennsylvania in 2009, PWDC was unable to fully negotiate new contracts with the entities running its EARN Centers, and so it authorized those entities to continue operating the centers on a cost-reimbursement basis. KRA thus kept operating the Germantown and Delancey EARN Centers and JSST programs for a

4

while. After PWDC withheld all payments from KRA because of the disputed FY 2008 overpayments, KRA stopped operating the EARN centers in October 2009, which fell within FY 2010.

That same month, PWDC sued KRA seeking damages for breach of contract, replevin, and conversion, arguing that KRA was overpaid and failed to return the overpayment. KRA filed counterclaims seeking payments that PWDC withheld. PWDC conceded that KRA was owed nearly sixty thousand dollars ($59,190) from FY 2009 and nearly two million dollars ($1,998,719) for its work during FY 2010. But once those amounts were deducted from the amount it said it had overpaid KRA, PWDC demanded one hundred and sixty thousand dollars ($161,151) from KRA.

### B. Procedural Background

At trial, each side presented sharply contrasting theories of contract interpretation. The central dispute was over whether the FY 2008 contract required performance-based payments to be somehow linked to expenditures. KRA argued that the contract unambiguously entitled KRA to full payment for all performance benchmarks achieved. PWDC, on the other hand, argued that performance-based payments in excess of expenditures constituted excess profit that had to be returned to PWDC. KRA moved for summary judgment, which was denied, and then made a *motion in limine* before the start of trial seeking to exclude parol evidence regarding the proper interpretation of the contract. The District Court rejected KRA's argument and concluded that the contract was ambiguous. As a result, the Court allowed extrinsic evidence to be presented to the jury. Over KRA's objection, the jury was allowed to consider the Commonwealth's audit

report and so-called Subcontractor Expenditure Summary forms completed by KRA at the end of FY 2008, which reported that KRA did not have excess program income to return to PWDC.

KRA was not only on the losing end of rulings that allowed evidence in, it also lost on rulings that kept evidence out. The Court excluded certain documents produced by KRA in response to PWDC's audit. Those documents were offered to justify some of the payments that had been disallowed by PWDC. The Court also excluded, as irrelevant, an e-mail from PWDC's former President to a Commonwealth official. The email discussed changes to PWDC's budget proposal for FY 2010, which would cap "the amount that EARN Centers can earn for each performance benchmark[.]" (App. at 2586.) According to the email, the changes were "absolutely necessary" since "[l]ast year most centers earned above the contract amount in certain performance benchmarks, which 'busted' the budget but did not get … the desired results[.]" (*Id.*)

At trial, PWDC and KRA continued to dispute the propriety of PWDC's disallowance of certain payments sought by KRA for FY 2009. KRA claimed that PWDC did not have evidence to support those disallowances. But PWDC presented its audit report and testimony from those who had prepared it.

After hearing extensive testimony, the jury ruled in favor of PWDC. It adopted PWDC's damage estimates in full and concluded that KRA owed PWDC $161,151. KRA filed a motion for judgment as a matter of law or for a new trial. The Court denied the motion, and KRA filed this timely appeal.

6

## II. DISCUSSION[3]

KRA raises three challenges before us. First, it argues that the District Court improperly concluded that the FY 2008 contract was ambiguous. Because KRA urges that the contract was unambiguous, it likewise believes that parol evidence should not have been admissible and that the jury should not have been permitted to consider PWDC's interpretation of the contract. Second, KRA claims that the District Court erred when it admitted into evidence certain documents introduced by PWDC and excluded others introduced by KRA. Finally, KRA challenges specific payment disallowances for indirect costs incurred during FY 2009. We address each of those arguments in turn.

### A. Contract Ambiguity and Parole Evidence

Pennsylvania law, which governs the interpretation of the contract, permits extrinsic evidence "where a term in the parties' contract is ambiguous[.]" *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 437 (Pa. 2004). "Determining whether a contract is ambiguous is a legal question, and our review is plenary." *Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999). A contract is ambiguous when "it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1995)).

---

[3] The District Court had jurisdiction under 28 U.S.C. §1332. We have jurisdiction pursuant to 28 U.S.C. § 1291.

If a contract is ambiguous, then "a decision as to which of the competing interpretations of the contract is the correct one is reserved for the factfinder, who would examine the content of the extrinsic evidence (along with all the other evidence) in order to make this determination." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 94 (3d Cir. 2001).

We agree with the District Court that the FY 2008 contract between PWDC and KRA was ambiguous. Ambiguity arises from three parts of the contract.

To begin with, the definition section of the contract defines two closely related key terms – "program income"[4] and "profit"[5] – in an internally inconsistent fashion.

---

[4] Whether KRA's revenue is considered program income is perhaps the most bitterly contested issue in this case. A portion of the contract explicitly states that "[a]ll program income … realized in operating a program provided for under this agreement … shall be reported and returned to PWDC." (App. at 1066.) Program income is defined as "income" derived from a variety of sources such as interest, rental and service fees, and the sale of commodities. KRA argues that, as a commercial organization, its revenue is not considered program income and need not be returned to PWDC. (*See* App. at 759 (defining program income, in part, as "revenue in excess of costs earned by organizations other than those that are commercial").) PWDC, in contrast, argues that a more general clause applies to all payments including those earned by for-profit organizations such as KRA. (*See id.* (defining program income in performance-based contracts to "include[] the difference between the payments received for completing the performance benchmarks and the actual expenses incurred in operating the program during the program year").)

[5] KRA and PWDC specifically argue over whether the contract puts any limits on KRA's ability to earn profit. Profit is defined as "an amount in excess of the cost necessary to operate a program." (App. at 759-60.) PWDC argues that the contract only allows profit under a cost-reimbursement contract. (*See id.* ("Profit is allowable under a cost-reimbursement agreement to the extent that it is determined reasonable during contract negotiations.").) Alternatively, it argues that the contract cabins profit to no more than 10% of the reimbursable costs. (*See id.* (noting that "the combination of profit and administrative cost must not exceed 10%").) KRA on the other hand argues that the

Consequently, KRA and PWDC were both able to offer plausible interpretations of those terms.

Next, the method of payment section, the portion of the contract that describes the process KRA used to invoice costs and record expenses, is ambiguous as to whether or not KRA was required to maintain records of expenses incurred in order to receive performance-based payments. KRA was "responsible for maintaining adequate books/records to document the costs incurred to execute programming under th[e] contract." (App. at 764.) That contractual language is consistent with PWDC's position. On the other hand, the same section lists supporting documentation that a party may provide when seeking reimbursement under a performance-based contract, but the list conspicuously omits documentation regarding expenditures. (*See* App. at 764 (listing supporting documentation as including "copies of enrollment reports, attendance records, employment verification forms, pay stubs and/or copy of completion certificates or paperwork.").)

Finally, the budget, which is contained in Rider A and incorporated by reference into the contract, offers some support for KRA's position but remains open to PWDC's reading as well. It sets out all of the expected payments under the contract, including the total "Prospective Performance Based-Payments" for which KRA could qualify. (App. at 796.) That amount is listed without any reference to cost, and the budget only mentions that KRA would be subject to a quarterly performance review to determine whether KRA

contract is silent as to profit under hybrid contracts and that therefore such profit is permitted without limits.

9

"is meeting the performance goals" set out in the contract.  (App. at 798.)  KRA relies heavily on the absence of any language linking performance-based payments to actual expenses.  PWDC, however, rightly points out that nothing in the budget is incompatible with PWDC's reading or forecloses the possibility of requiring the return of program income in excess of costs.

KRA argues that those ambiguities should be resolved in its favor due to policy considerations.  Specifically, it claims that, since the risk of loss for failing to meet performance-based metrics would be too great without a commensurate opportunity to earn unconstrained profit, no for-profit entity would enter into a contract under the terms described by PWDC.  But Pennsylvania law instructs that "ambiguous writings are interpreted by the finder of fact."  *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 469 (Pa. 2006).  Here, the District Court rightly concluded that there was ambiguity.  The jury then heard the parties' positions and decided against KRA.  "[V]iewing all the evidence which ha[d] been tendered and should have been admitted in the light most favorable to the party opposing the motion," we cannot say that "no jury could decide in [PWDC's] favor."  *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993) (citation omitted).

### B.      The District Court's Evidentiary Rulings

KRA challenges several of the District Court's evidentiary rulings.  We review decisions to admit or exclude evidence for abuse of discretion.  *See United States v. Furst*, 886 F.2d 558, 571 (3d Cir. 1989).

10

### 1. Inclusion of Evidence

KRA challenges the admission of the Commonwealth's audit, arguing that it was inadmissible hearsay. The District Court agreed that the audit was hearsay but concluded that it was still admissible under the hearsay exception for regularly conducted business activities. FED. R. EVID. 803(6)(B). Because there was evidence presented at trial that the audit was made and kept in the ordinary course of business, the Court was within the bounds of its discretion in ruling that the audit could be admitted.

KRA also argues that the audit and the Subcontractor Expenditure Summary forms were irrelevant. We disagree. Relevance is a low bar and those documents undoubtedly clear it. *See* FED R. EVID. 401. The audit supported PWDC's damage calculations. The forms showed that PWDC's contemporaneous understanding of the contract term "program income" was fully compatible with its theory at the time of trial, so the forms were capable of assisting the jury in its effort to understand the contract. The Court did not abuse its discretion by admitting the documents.

### 2. Exclusion of Evidence

KRA also challenges the exclusion of evidence it offered. The documents it submitted to try to reconcile its claims with expenditures were not documents "kept in the course of a regularly conducted activity of a business," nor was producing those documents "a regular practice" of KRA. FED. R. EVID. 803(6)(B), (C). They were therefore properly excluded as inadmissible hearsay.

The District Court's decision to exclude the email authored by PWDC's President is another matter. The Court dismissed that email as irrelevant, but it is hard to see how

11

that could be so since it bore directly on how the budget was affected by contractual benchmarks. It was written soon after the end of FY 2009 and discussed how contracts in that year for EARN centers had worked out financially. PWDC's President's statement that many of the EARN centers "earned above the contract amount in certain performance benchmarks" and that those payments "'busted' the budget" could have given the jury a basis for accepting KRA's interpretation of the contract. (App. at 2586.) If performance payments had "busted" the budget, then the jury could have concluded that PWDC had not cabined profit to 10% and had instead allowed contractors to keep all of their profits.

But even if the District Court should have allowed the e-mail into evidence, the error was harmless. It is highly likely that the admission of the e-mail would not have altered the jury verdict. *See McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 917 (3d Cir. 1985) (holding that nonconstitutional errors in civil suits "are harmless only if it is highly probable that the errors did not affect the outcome of the case"). While the e-mail could have supported KRA's interpretation of the contract, it also could be interpreted in harmony with PWDC's interpretation. Testimony at trial suggested that the budget was "busted" as a result of the mandate that an EARN center accept all "clients that are referred to that EARN Center." (App. at 512.) In light of the economic downturn, there was greater demand for the services of the EARN Center and therefore PWDC incurred unusually high expenses. (App. at 512.) And, overall, PWDC's case was strong. Even some of the witnesses called by KRA supported PWDC's interpretation of the contract. Indeed, KRA's own internal audit supported PWDC's position that excess payments

12

needed to be returned to PWDC. (*See* App. at 2526 (noting that KRA "does not maintain any equity in the contract and any excess of cash received from Philadelphia Workforce Development Corporation over final expenditures is due back to Philadelphia Workforce Development Corporation").)

Given the ease with which PWDC could have drawn KRA's interpretation of the e-mail into question, and the strength of the evidence against KRA, we conclude that it is highly probable that the exclusion of the e-mail did not affect the outcome of the case. *McQueeney*, 779 F.2d at 917.

### C. Indirect Cost Calculations

The final issue before us concerns PWDC's decision to disallow payment of administrative costs that KRA incurred during FY 2009.[6] The budget filled out at the start of the fiscal year stated that KRA could be reimbursed for approximately one million dollars in administrative costs and other indirect costs ($490,472 for the Delancey EARN Center and $462,030 for the Germantown EARN Center). In the budget, those costs were broken down into categories (salaries, fringe benefits, operating expenses, equipment, supplies, indirect costs, other, and profit).

---

[6] In its brief, KRA also seems to broadly challenge all of PWDC's FY 2009 disallowances. But the administrative and indirect cost disallowances are the only ones that KRA points to with any specificity. We therefore find that KRA has failed to preserve its arguments regarding PWDC's other disallowances. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) (recognizing that it is well settled "that casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." (citing *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1066 (3d Cir. 1991))).

13

PWDC's internal audit found that KRA failed to adequately account for and categorize its administrative costs and instead lumped all of its administrative costs into the general category of "indirect costs." PWDC therefore disallowed all administrative costs for FY 2009. KRA, on the other hand, argues that it did not need to break out its administrative costs into categories because it had an agreement with the federal Department of Health and Human Services setting a fixed rate for the reimbursement of indirect costs, and so it could properly place all of its administrative costs into that general category.

KRA and PWDC both make plausible arguments based on contradictory parts of the FY 2009 budget. In the budget's breakdown of administrative costs by category, KRA is not entitled to reimbursement for indirect costs. A few pages later, however, the budget lists a reimbursement rate for indirect costs and a large "base" value for reimbursable indirect costs. (App. at 1333.) Those two sections of the budget seem to contradict each other.

Even though KRA could point to language supporting its argument, it did not otherwise offer evidence in support of its theory. The section that KRA relies on requires that "[a] copy of the current negotiated rate, supporting the base and rate must accompany the proposal." (App. at 1333.) No such negotiated rate accompanied the budget. And, at trial, KRA failed to produce the negotiated rate or any evidence that it had a fixed rate agreement with the Department of Health and Human Services. In contrast, PWDC put forth witnesses who testified that PWDC had conducted a line-by-line audit of all of KRA's claimed expenses and that the amounts that PWDC had

14

disallowed were consistent with the audit findings. Because of KRA's failure to substantiate its claims, the jury was free to accept PWDC's evidence and conclude that KRA had erroneously lumped all of its administrative costs into the category of indirect costs.

**III.   CONCLUSION**

For the foregoing reasons, we will affirm.