J-A02012-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| RONALD J. GULLA AND LAUREL M. GULLA, HUSBAND AND WIFE | : IN THE SUPERIOR COURT OF : PENNSYLVANIA |
| Appellants | : : |
| | : : |
| v. | : : |
| | : No. 814 WDA 2017 |
| HOWARD HANNA COMPANY, HOWARD HANNA REAL ESTATE SERVICES, HOWARD HANNA COMMERCIAL REAL ESTATE SERVICES AND WILLIAM MATTHEWS | : : : : : |

Appeal from the Order May 8, 2017
In the Court of Common Pleas of Washington County Civil Division at
No(s):  No. 2012-155

BEFORE:  BOWES, J., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED SEPTEMBER 19, 2018**

Ronald J. and Laurel M. Gulla, husband and wife, appeal from the May 8, 2017 order granting summary judgment in favor of Howard Hanna Company, Howard Hanna Real Estate Services, Howard Hanna Commercial Real Estate Services, and licensed real estate agent William Matthews (collectively "Howard Hanna"), on their claim under the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 2-101 *et seq.* After thorough review, we vacate the order granting summary judgment and remand for further proceedings.

We present the facts in the light most favorable to the Gullas, the non-moving party, in accordance with our standard of review from the grant of

summary judgment. The Gullas owned a 141-acre farm (the "Gulla Farm") in Hickory, Washington County, Pennsylvania. In 2002, the Gullas leased their oil and gas rights to Great Lakes Energy, the predecessor to Range Resources Company (collectively "Range"). Range drilled wells on their property, which were described by Mark Hunneshagen, the district landman for Range, as being "very, very, very good." Plaintiffs' Response in Opposition to Summary Judgment, 1/13/17, at Exhibit 9 (Deposition of Mark Hunneshagen, 2/24/16, at 84). However, in and around 2007, the Gullas complained to Range that its drilling and associated operations had contaminated their pond and property.

The record also reveals that, in the spring of 2007, Range was interested in purchasing a Washington County property for its field operations office. Mr. Matthews, a licensed real estate agent associated with Howard Hanna, was assisting Range in that endeavor. According to Mr. Matthews, he informed Mr. Hunneshagen of the availability of the Smith Farm in Mt. Pleasant prior to May 2007. Mr. Hunneshagen was interested in the property because he had been told by Range analysts that Range had an oil and gas lease on the Smith Farm. *Id*. at 83, 84, 172. Mr. Matthews accompanied Mr. Hunneshagen when he went to see the property. However, the Smith Estate did not want to sell the farm to Range as other members of the family owned and lived on adjacent properties.

Shortly thereafter, in May 2007, Range representatives suggested to the Gullas that Range buy the Gulla Farm for its field operations office.

- 2 -

There were negotiations between the Gullas and Range for the purchase of the Gulla Farm, but no signed sales agreement. Range proposed the idea of a 1031 tax-free exchange[1] of property, and specifically mentioned the Smith Farm as a possible replacement property for the Gullas. Range told the Gullas that they would like them to use their broker, Howard Hanna, and specifically Mr. Matthews, to facilitate such a transaction.

On May 31, 2007, Mr. Gulla met with Mr. Matthews at a restaurant in Cranberry, Butler County, to discuss Range's purchase of the Gulla Farm and a 1031 tax-free exchange. Mr. Matthews had a sales agreement with him, which he hoped the Gullas would sign, and which mentioned the tax-free exchange. Mr. Gulla advised Mr. Matthews that he would not sell unless an adequate unencumbered replacement parcel was available, *i.e.*, a property with its mineral rights attached.[2] They discussed the Smith Farm. Mr. Gulla asked Mr. Matthews to do a title search to make sure that the mineral rights of the Smith Farm were not encumbered, and Mr. Matthews assured him that he would do so.

On that day, the Gullas entered into an Exclusive Buyer Agency Contract ("EBAC") with Mr. Matthews and Howard Hanna, retaining Howard

---

[1] According to Mr. Matthews, the 1031 exchange was his idea.

[2] Mr. Matthews does not dispute that Mr. Gulla expressed this requirement. Plaintiffs' Response in Opposition to Summary Judgment Exhibit 5 (Deposition of William Matthews, 5/20/14, at 262).

Hanna and Mr. Matthews to represent them regarding any property that the Gullas chose to buy during the term of the contract. The Gullas also agreed to a dual agency, meaning that Howard Hanna could represent the seller of the property that the Gullas might buy. Paragraph 6 of the EBAC, entitled "OTHER," contained additional typed disclosures and provisions peculiar to the parties' arrangement. Howard Hanna disclosed therein that Range "has consulted with Howard Hanna to assist Ron Gulla to seek council [sic] (Legal & Accounting) to facilitate a 1031 exchange if [Range] purchases 29 Gulla Lane, Hickory PA 15340." EBAC, 5/31/07, at 1-2. In addition, the agreement recited that Range had agreed to pay Howard Hanna a "minimal fee" if, through Howard Hanna's efforts, the 1031 exchange was accomplished and Range purchased the Gulla property. *Id*. at 2. Howard Hanna disclaimed any notion that it was "doing the 1031" transaction, and defined its role as "assisting Ron Gulla obtain professional council [sic] to facilitate this transaction." *Id*. The Gullas acknowledged their understanding that "if a 1031 transaction is not done correctly[,] all tax savings could be lost," and that it was Mr. Gulla's sole "responsibility to make sure that the tax savings/1031 will apply." *Id*. It was further clarified therein that Howard Hanna would represent Ron Gulla in purchasing the replacement property, but that Range was also employing Howard Hanna to find other properties if it could not come to terms with the Gullas. Howard Hanna represented that "up to this point," it had not been involved in

negotiating with Mr. Gulla for the Gulla Farm, but that its licensee, Mr. Matthews, had answered Range's real estate questions "and provided a Pennsylvania Association of Realtors Sales Agreement for their offer to Ron Gulla." *Id*. At the end of paragraph 6, Mr. and Mrs. Gulla expressly authorized Howard Hanna's involvement in the negotiations with Range for the purchase of the Gulla Farm, and agreed that Howard Hanna would serve as a dual agent representing both Mr. Gulla and Range, with any fee to be paid by Range. *Id*.

The EBAC also contained the "Notices to Buyers," which provided *inter alia*, that Mr. Matthews could show or present the same properties to other buyers, and defining conflict of interest as "when a Broker or Licensee has financial or personal interest in the property where Broker or Licensee cannot put Buyer's interest before any other[,]" and in that event, requiring Broker to notify Buyer in a timely manner. *Id*. at 3. The Buyer, herein the Gullas, acknowledged that they had received the Pennsylvania State Real Estate Commission Consumer Notice, 49 Pa. Code §35.336, which was incorporated within the Notice.[3] By its terms, the EBAC was the "entire

---

[3] The Consumer Notice defines a buyer agent as a licensee who works exclusively for the buyer and acts in the buyer's best interest, even if paid by the seller. A dual agent works for both the buyer and seller, but cannot take any action that is adverse or detrimental to either party. 49 Pa.Code § 35.336(c). The Notice provides further that all licensees owe consumers, *inter alia*, the duty to deal honestly and in good faith and meet the practice
*(Footnote Continued Next Page)*

agreement between Broker and Buyer[,]" Howard Hanna and the Gullas respectively. *Id*. at 2. There was no mention of the Smith Farm or any particular properties in the EBAC.

By email dated June 7, 2007, Mr. Matthews provided Mr. Gulla with listings for thirty-three commercial properties for sale in Washington, Westmoreland, and Allegheny counties. Neither the Smith Farm nor any other farm property was included.

Three weeks after the execution of the EBAC, Mr. Matthews was still entertaining the possibility that Range would purchase the Smith Farm instead of the Gulla Farm. In a June 27, 2007 email to Mr. Hunneshagen, Mr. Matthews suggested that Range offer $1.5 to $1.6 million dollars for the Smith Farm. He told Mr. Hunneshagen that although the Smiths did not want Range as a neighbor before, he thought a higher offer "might make them reconsider" since a $1.1 million offer had fallen through in the interim. Exhibit 8 to Plaintiffs' Response in Opposition to Motion for Summary Judgment. Attached to that email was a flier that Mr. Matthews proposed to forward to Howard Hanna agents asking them to prospect for a thirty to 100-acre property available for immediate purchase near the Gulla Farm. Thus, as of the end of June 2007, Range had not committed to purchasing

*(Footnote Continued)* ────────────────

standards required by the Real Estate Licensing and Registration Act ("RELRA"), 63 P.S. § 455.101 *et seq*.

the Gulla Farm, and Mr. Matthews was actively looking for a suitable property for Range's field operation in the event Range did not purchase the Gulla Farm.[4]

On July 26, 2007, Mr. Matthews accompanied the Gullas on their first visit to the Smith Farm. At Mr. Matthews' urging, they made an oral offer of $900,000 for the property. The Gullas maintain that, at that time, they were willing to offer more to purchase the property, even as much as the $1.3 million dollar list price. Later that same day, they met with Mr. Matthews and prepared a written offer to sell their farm to Range. The offer was not contingent on the Gullas obtaining the Smith Farm or any other replacement property or on the successful completion of a 1031 tax-free exchange. After the offer had been conveyed to Range, Mr. Matthews told the Gullas that their $900,000 verbal offer on the Smith Farm had been rejected. In a July 28, 2007 email, Mr. Matthews sent the Gullas more than four dozen listings for farms and acreage in Beaver, Butler, and Washington counties, including the Smith Farm. Two days later, Mr. Matthews advised the Gullas that Range had accepted their offer to sell the Gulla Farm for

---

[4] Mr. Matthews acknowledged in his deposition that, although he had a buyer's relationship with the Gullas, he "was more concerned in facilitating the transaction between the buyer and the seller on the initial thing with Range and Gulla. Then [his] focus was on buying a separate property for Ron Gulla." Plaintiffs' Response in Opposition to Summary Judgment, Exhibit 5 (Deposition of William Matthews, 5/20/14, at 102).

$1.52 million, resulting in a fully executed sales agreement for that property.

The Gullas advised Mr. Matthews that they wanted the Smith Farm. In September, Mr. Matthews encouraged them to pursue that property, and on September 19, 2007, they submitted a $1.1 million offer expressly including all mineral rights. After the presentation of that offer, Mr. Matthews informed the Gullas that sixty-five acres of the 165-acre Smith Farm was subject to an oil and gas lease with Range executed in 2006. He also told the Gullas that he had not performed the title search they wanted on that property. The Smiths subsequently declined the Gullas' $1.1 million offer and, with the new information about the oil and gas lease encumbering the Smith Farm, the Gullas abandoned any interest in that property. Thereafter, the Gullas refused to close on the sale of the Gulla Farm. Range sued them for specific performance of the sales agreement, and Range prevailed on summary judgment.

The Gullas commenced this action under the UTPCPL against Mr. Matthews and Howard Hanna to recover damages for the broker and agent's deceit and misrepresentations regarding the suitability of the Smith Farm as a replacement property. They alleged that the misrepresentations and non-disclosures induced the Gullas to sell their farm to Range. They averred that Mr. Matthews misrepresented that he had performed a title search on the Smith Farm, when he had not, and they justifiably relied upon that

representation. Alternatively, Mr. Matthews intentionally, recklessly, and wrongfully concealed that he had not performed a title search to convince the Gullas to sell to Range and further Howard Hanna's relationship with Range. They alleged further that Mr. Matthews intentionally, recklessly, and wrongfully concealed the fact that the Smith Farm was encumbered with an oil and gas lease so that the Gullas would sell to Range. Had he not deceived them, the Gullas maintain that they would not have sold their farm to Range.

Howard Hanna moved for summary judgment on the UTPCPL action on six grounds.[5] The trial court determined that summary judgment was appropriate based on the parol evidence rule, concluding that any misrepresentations by Mr. Matthews prior to the EBAC merged into that

_____

[5] In support of summary judgment, Howard Hanna also contended that there was no evidence that Mr. Matthews or Range knew there was a gas lease on part of the Smith Farm prior to the execution of the agreement of sale for the Gulla Farm. In addition, Howard Hanna asserted that the Gullas could not prove that they justifiably relied upon Mr. Matthews' performance of a title search on the Smith Farm, as they made two offers on that property with no assurances from Mr. Matthews that he had performed one. They characterized the allegations as sounding in negligence on the part of Mr. Matthews for failing to make the sale of the Gulla Farm contingent on their acquisition of the Smith Farm or other suitable property, a claim that was time-barred. Howard Hanna contended that collateral estoppel operated to bar the Gullas from arguing that they relied on any representation that the Smith Farm was unencumbered, and finally, that there was no causal connection between the alleged misrepresentations and the non-occurrence of the 1031 exchange for which they were seeking damages.

agreement, and hence, were inadmissible.[6]  The court held further that any discussions or representations after the execution of the EBAC were subsequent oral modifications that had to be in writing in order to be enforceable.  The Gullas timely appealed from the order granting summary judgment, and raise three issues for our review:

1. Whether the trial court committed an error of law and/or abused its discretion by refusing to liberally construe the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 2-101, *et seq*. "UTPCPL") and dismissing the Gullas' cognizable statutory cause of action where the competent record evidence demonstrated that Matthews and Howard Hanna's statements, assurances, writings and conduct were capable of being interpreted in a misleading way and created a likelihood of confusion or misunderstanding for the Gullas, which requires that the Gullas' claim be submitted to a trier of fact?

2. Whether the trial court committed an error of law and/or abused its discretion by misapplying the parol evidence rule to the Gullas' independent statutory cause of action arising from Matthews and Howard Hanna's violations of their fiduciary duties and the UTPCPL?

3. Whether the trial [court] committed an error of law and/or abused its discretion by misapplying the parol evidence rule to bar the consideration of evidence relating to both subject matter not addressed in a contract and oral statements, assurances, writings, and conduct subsequent to the execution of a collateral agreement?

Appellants' brief at 4.

_____

[6] The trial court did not address whether summary judgment was proper on any of the other five grounds asserted by Range.  Nor do Appellees argue on appeal that these other grounds offer additional or alternative bases to affirm the grant of summary judgment.

At issue herein is the propriety of the trial court's grant of summary judgment in favor of Howard Hanna and Mr. Matthews based on the parol evidence rule and the integration clause contained in the EBAC. The law is well settled that

> [s]ummary judgment is appropriate where the record clearly demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. Whether there are no genuine issues as to any material fact presents a question of law, and therefore, our standard of review is *de novo* and our scope of review plenary.

*Estate of Agnew v. Ross*, 152 A.3d 247, 259 (Pa. 2017) (internal citations omitted). "This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record." *Wells Fargo Bank, N.A. v. Joseph*, 183 A.3d 1009, 1012 (Pa.Super. 2018) (quoting *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010) (internal citations and quotation marks omitted)).

Preliminarily, we note that this is not an action seeking to void the sale of the Gulla Farm to Range. Rather, the Gullas seek to recover damages under the UTPCPL from their licensed real estate agent and broker, Mr. Matthews and Howard Hanna, for losses they sustained as a consequence of Mr. Matthews' misrepresentations regarding the existence of oil and gas leases on the Smith Farm. They maintain that, but for the

misrepresentations, they would not have sold their farm to Range. Thus, the focus herein is on the EBAC and Howard Hanna's conduct vis-à-vis its clients, the Gullas. Howard Hanna concedes that a cognizable claim under the UTPCPL may be asserted against an agent in the context of a real estate transaction, but maintains that no claim will lie herein because the parol evidence rule operates to preclude evidence of the alleged misrepresentation.

The UTPCPL forbids unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. 73 P.S. § 201-3. The statute proscribes twenty specific acts, *id*. at § 201-2(4)(i)-(xx), and contains a catch-all provision that prohibits persons from "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." *Id*. at § 201-2(4)(xxi). The law, enacted in 1968, was amended in 1976 to add a private cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property . . . ." *Id*. at § 201-9.2.[7] The UTPCPL is a remedial statute that is to be liberally construed to effectuate its purpose of preventing "'unfair or deceptive' business practices." *Commonwealth by*

_____

[7] In private actions under the UTPCPL, the court has the discretion to award up to three times the actual damages sustained, as well as costs and attorney fees.

*Creamer v. Monumental Properties, Inc.*, 329 A.2d 812, 815 (Pa. 1974); *see also DeArmitt v. New York Life Ins. Co.*, 73 A.3d 578, 591 (Pa.Super. 2013) (reaffirming remedial goals of the statute to protect consumers from unfair or deceptive practices).

The trial court ruled that the Gullas were purchasers of real estate brokerage services, and thus had standing to bring a private cause of action under the UTPCPL to seek redress for fraudulent and deceptive conduct allegedly perpetrated by Mr. Matthews and Howard Hanna. In order to maintain such a claim, however, "a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004) (citing *Weinberg v. Sun Co. Inc.*, 777 A.2d 442, 446 (Pa. 2001)). Reliance is not merely a simple causal connection between the misrepresentation and the harm. A plaintiff must "show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 955 F.Supp. 2d 452 (E.D. Pa. 2013). However, justifiable reliance need not be proven if there is a fiduciary relationship between the parties. A confidential relationship for purposes of the UTPCPL can be established by a showing of either "overmastering influence" or of "weakness, dependence or trust." *Basile v. H & R Block*, *Inc.*, 777 A.2d 95, 101 (Pa.Super. 2001); *see also*

***Yenchi v. Ameriprise Fin., Inc.***, 161 A.3d 811, 820 (Pa. 2017) (holding that even where a fiduciary duty does not exist as a matter of law, fiduciary duties may be found in "circumstances where the relative position of the parties is such that the one has the power and means to take advantage of, or exercise undue influence over, the other.").

The Gullas pled that their relationship with Howard Hanna and Mr. Matthews was a fiduciary relationship. They also alleged that they justifiably relied on Mr. Matthews' misrepresentations regarding his performance of a title search on the Smith Farm, and that it was free and clear of all oil and gas encumbrances. According to the Gullas, those misrepresentations induced them to sell their farm to Range. The Howard Hanna defendants countered that evidence of the misrepresentations was barred by the parol evidence rule, and hence, summary judgment was proper.

The parol evidence rule is an evidentiary rule that precludes the parties to a written contract that was intended to be their entire agreement from introducing **prior** oral representations or negotiations concerning a subject specifically dealt with in the written contract, in order to vary or modify the contract terms. The prior oral representations are deemed to be merged into the writing. The only exceptions to the rule are where fraud, accident, or mistake are alleged and proven. ***See Bardwell v. The Willis Co.***, 100 A.2d 102, 104 (Pa. 1953) (articulating the parol evidence rule).

The purpose of the rule is "to preserve the integrity of written agreements by refusing to permit the contracting parties to attempt to alter the import of their contract through the use of contemporaneous [or prior] oral declarations." *Rose v. Food Fair Stores, Inc.*, 262 A.2d 851, 853 (Pa. 1970); *see also Lenzi v. Hahnemann University*, 664 A.2d 1375, 1379 (Pa.Super. 1995) ("The parol evidence rule seeks to preserve the integrity of a written agreement by barring the contracting parties from trying to alter the meaning of their agreement through use of contemporaneous oral declarations."). "Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement." *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924).

Nonetheless, the parol evidence rule does not bar all evidence of prior dealings between the parties. Any writing must be interpreted, and to the extent that a contract is ambiguous, parol evidence is admissible to clarify indefinite terms. *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468-69 (Pa. 2006). Moreover, the parol evidence rule only operates to bar evidence of prior oral or written agreements or negotiations about subject matter covered in the contract. As our Supreme Court clarified in *Yocca*, *supra* at 436 (emphasis added), "[o]nce a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements

- 15 -

**involving the same subject matter** as the contract is almost always inadmissible to explain or vary the terms of the contract." ***See also Youndt v. First Nat'l Bank***, 868 A.2d 539, 545 (Pa.Super. 2005). The bottom line is that prior inconsistent statements and negotiations between the parties are inadmissible to vary the terms of the written contract.

The EBAC contained an integration clause, which has been held to "make the parol evidence rule particularly applicable." ***Hart v. Arnold***, 884 A.2d 316, 340-41 (Pa.Super. 2005) (quoting ***1726 Cherry Street Partnership by 1726 Cherry Street Corp. v. Bell Atlantic Properties, Inc.***, 653 A.2d 663, 665 (Pa.Super. 1995)). Where a written contract is unambiguous, it "must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, or other writings, are admissible to explain or vary the terms of the contract." ***Id***.

In ruling on Range's claim that the parol evidence rule precluded evidence of the alleged misrepresentation, the trial court examined the EBAC, the written contract between the Gullas and Howard Hanna. It noted that the EBAC did not specifically discuss the Smith Farm or make the sale of the Gulla Farm contingent upon the Gullas finding a suitable replacement property. Trial Court Opinion, 5/8/17, at unnumbered 4. Moreover, the EBAC contained an integration clause providing:

> This is the entire agreement between Broker and Buyer. Any verbal or written agreements that were made before are not a

part of this agreement. Any changes or additions to this agreement must be in writing and signed by Broker and Buyer.

EBAC, 5/31/07, at 2.

The trial court concluded that since the EBAC was the whole agreement of the parties, the parol evidence rule applied and precluded evidence of the parties' prior oral negotiations or agreements. *Id*. at unnumbered 5. The court rejected the Gullas' argument that the parol evidence rule was inapplicable because the subject of the evidence, the Smith Farm, was not addressed in the EBAC. Instead, the court found that the EBAC's general discussion of replacement properties met the same subject matter requirement for applying the rule and barring the evidence. *Id*. at unnumbered 6. Furthermore, to the extent that the Gullas were relying upon oral representations made after the EBAC was executed, the trial court concluded that these were oral modifications that had to be in writing and signed by the parties to be admissible. *A.D.P., Inc. v. Morrow Motors, Inc.*, 969 A.2d 1244 (Pa.Super. 2009). The court viewed Mr. Matthews' representation that he would perform a title search on the Smith Farm as an amendment to the EBAC that was not placed in writing and signed by the parties. Furthermore, there was no evidence of conduct on the part of Howard Hanna establishing an intent to waive the writing requirement, and hence, no genuine issue of fact. Trial Court Opinion, 5/8/17, at unnumbered 6.

The Gullas argue that they presented a cognizable claim under the UTPCPL. Mr. Matthews held himself out as their agent. Mr. Gulla submitted an affidavit to the effect that Mr. Matthews assured him through his conduct and statements that the Smith Farm was free of oil and gas leases and that he had performed the promised title search. They contend that the trial court erred in disregarding that sworn testimony in finding no genuine issue of material fact that would preclude entry of summary judgment.

The Gullas also contend that the trial court erred in applying the parol evidence rule to preclude evidence of Mr. Matthews' misleading and deceptive conduct and representations. In support of their contention, they direct our attention to **_Youndt_**, **_supra_**, holding parol evidence admissible in fraud cases.

Finally, the Gullas maintain that the written contract, the EBAC, is collateral to the issue, as the statutory action herein is not based upon that writing. Furthermore, the subject matter of the misrepresentations is not addressed in the EBAC, and the misrepresentations are not offered to contradict the terms of that contract. Moreover, the misrepresentations and deceitful conduct occurred subsequent to the EBAC, and did not purport to vary the terms of the EBAC. Finally, the Gullas argue that whether Mr. Matthews' words were intended to modify the earlier agreement is a question of fact for the factfinder.

After a thorough review of the record, we conclude that the trial court misapplied the parol evidence rule. The EBAC defined the exclusive buyer agency relationship between Mr. Matthews, Howard Hanna, and the Gullas. It also served as a disclosure of Howard Hanna's relationship with Range, and contained the Gullas' consent to Howard Hanna acting in a dual agency capacity if they should sell their property to Range. In addition, the EBAC clarified the respective responsibilities of the parties should a 1031 tax-free exchange become a possibility, placing the onus upon the Gullas to obtain the legal and financial expertise necessary to obtain the tax benefits. The agreement did not include details regarding the manner in which Howard Hanna would perform its services, nor did it incorporate discussions about the Gullas' requirements for a suitable replacement property. The Smith Farm was not part of the written agreement between the parties, and the search for replacement properties was not limited to the Smith Farm.

Even assuming the parties discussed the Smith Farm as a possible replacement property prior to or contemporaneously with the execution of the EBAC, it was not the subject of the written agreement. Mr. Gulla discussed with Mr. Matthews that a replacement property would have to be free of oil and gas leases, and Mr. Matthews acknowledged that understanding. Response in Opposition to Summary Judgment Exhibit 5 (Deposition of William Matthews, 5/20/14, at 62). He purportedly asked Mr. Matthews to do a title search on the Smith Farm to check whether it met

that requirement. According to Mr. Gulla, Mr. Matthews assured him that he would conduct such a search. These and similar discussions about the suitability of possible replacement properties were not spelled out in the EBAC.

In order to make out a claim under the UTPCPL, the Gullas necessarily have to introduce the substance of the misrepresentations Mr. Matthews made about the Smith Farm. We find that the content of discussions relative to the Smith Farm that occurred prior to or contemporaneously with the execution of the EBAC were not offered by the Gullas to vary the terms of that written contract. Nor did they contradict the terms of the written contract. We agree with the Gullas that, in this case, the EBAC was largely collateral to the UTPCPL claim.

We observe further that the parol evidence rule does not fit squarely within the construct of the UTPCPL. In *Yocca*, *supra*, our High Court framed the parol evidence issue in terms of justifiable reliance. It concluded that one asserting a claim under the UTPCPL "cannot justifiably rely on a defendant's representations that are in direct conflict with the terms of the contract." *Yocca*, *supra* at 439 (finding that plaintiffs/buyers could not justifiably rely upon representations in a brochure that contradicted the terms of the subsequent written contract). When we view the representations through the lens of justifiable reliance rather than as parol evidence, we find that the EBAC presents no impediment to the Gullas'

ability to prove that they justifiably relied upon representations about the Smith Farm. The proffered evidence simply does not contradict or refute the written terms of the EBAC.

Notably, the misrepresentations at the center of this UTPCPL claim were alleged to have been made by Mr. Matthews after the execution of the EBAC, and thus do not implicate the parol evidence rule. Consequently, the trial court excluded evidence of Mr. Matthews' later assurances that he had performed a title search on the Smith Farm and that it was free of oil and gas encumbrances as subsequent oral modifications of the EBAC that were not placed in a writing.

We do not find the alleged misrepresentations to be an oral modification of any term in the EBAC as the EBAC did not address the Smith Farm and it did not purport to delineate how Mr. Matthews would perform his services on behalf of the Gullas. The EBAC's general reference to replacement properties does not foreclose evidence of later discussions and representations about the Smith Farm in particular. In short, Mr. Matthews' subsequent representations about a particular property did not modify the terms of the EBAC, and thus did not have to be in writing. Nor were they offered by the Gullas for that purpose. The evidence was offered to substantiate allegedly deceitful practices on the part of Mr. Matthews that violated the UTPCPL, upon which the Gullas justifiably relied in selling the

Gulla Farm to Range, to their detriment.[8]  For these reasons, we find the trial court erred in applying the parol evidence rule and the contractual prohibition against subsequent oral modifications to grant summary judgment herein.

Given our standard and scope of review, there is no prohibition against this Court affirming the grant of summary judgment on one of the alternative bases urged by Howard Hanna below.  However, viewing the record in the light most favorable to the Gullas, we find sufficient evidence of misrepresentations and deceitful practices to create a genuine issue of material fact, and preclude the entry of summary judgment on that basis.[9]

_____

[8] The purported misrepresentations of Howard Hanna do not merge into the integrated sales agreement between the Gullas and Range as the integration clause in that contract only merged prior oral representations and agreements between the parties to that contract.  In pertinent part, the sales agreement provided: "This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale."  *See* Standard Agreement for the Sale of Real Estate, 7/30/07, at ¶28(A).  Hence, we reject Howard Hanna's argument that its misrepresentations to the Gullas prior to the agreement of sale for the Gulla Farm are inadmissible as violative of the parol evidence rule.

[9] Pa.R.C.P. 1035(b) provides that summary judgment will be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, **together with the affidavits**, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  In his affidavit, Mr. Gulla attested that Mr. Matthews either actively misrepresented or failed to disclose information that he knew about the status of the mineral rights of the Smith Farm.  Mr. Matthews denied that he knew the Smith Farm was encumbered by the oil
*(Footnote Continued Next Page)*

There was sufficient evidence of a fiduciary relationship between Howard Hanna and the Gullas or justifiable reliance by the Gullas upon the misrepresentations of Mr. Matthews to present a genuine issue of material fact for the factfinder.[10] We find no merit in Howard Hanna's contention that the instant claim is merely a time-barred negligence claim against Mr. Matthews and Howard Hanna for failing to make the sale of the Gulla Farm contingent on their acquisition of the Smith Farm or other suitable property. The UTPCPL presents a remedy for damages caused by deceit and misrepresentations in the conduct of trade or commerce. Moreover, collateral estoppel is inapplicable as the issue in the prior action against Range was not identical to the issue herein involving Mr. Matthews and Howard Hanna.[11]

*(Footnote Continued)* ―――――――――――

and gas lease. In light of Mr. Matthews' prior involvement with Mr. Hunneshagen in Range's possible purchase of the Smith Farm, and Mr. Hunneshagen's knowledge of the oil and gas lease on that property, one might reasonably infer that Mr. Matthews learned about the lease.

[10] In prior litigation between the Gullas and Range, summary judgment was granted based on the fact that the parol evidence rule, together with the integration clause in the sales agreement for the Gulla Farm, operated to preclude the Gullas from offering evidence of Range's prior oral representations about the Smith Farm.

[11] Range commenced an action against the Gullas for specific performance of the sales agreement for the Gulla Farm. The Gullas defended by alleging that misrepresentations by Range employees had induced them to enter the contract. Summary judgment was granted in favor of Range based on the parol evidence rule and the merger of any such representations into the fully integrated sales agreement.

We find considerable merit, however, in Howard Hanna's contention that there is no causal connection between the alleged misrepresentations and the non-occurrence of the 1031 tax-free exchange for which the Gullas are seeking damages. Neither the sale of the Gulla Farm nor the purchase of a replacement property was contingent upon qualifying for favorable 1031 tax-free exchange benefits.[12] Nonetheless, since the Gullas have alleged damages beyond the lost 1031 tax benefits, and resolution of that narrow issue is not dispositive of damages generally, we decline to grant partial summary judgment without the benefit of the trial court's reasoning or briefing by the parties regarding this issue.

Order vacated. Case remanded. Jurisdiction relinquished.

Judge Olson joins the memorandum.

Judge Kunselman concurs in the result.

_____

[12] The Gullas' own evidence suggests that the Gulla Farm would not have qualified for section 1031 tax benefits. The Gullas' expert opined that the exchange of a principal residence did not qualify for section 1031 tax treatment; both the new and the old property must have been held for investment or business use to qualify. Even if the Gullas could have treated the portion of their property subject to the oil and gas lease with Range as an investment property, a replacement property would also have to have been held for investment purposes. The expert noted that the Gullas did not want a replacement property that was encumbered by a lease, which was the case with the Smith Farm. *See* Expert Report of Robert D. Hoag, CPA, MST, CGMA, 11/11/16.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/19/2018