2025 PA Super 188

| | | |
|---|---|---|
| SEAN WEST AND AMY WEST, AS PARENT AND NATURAL GUARDIAN OF JULIANA WEST, A MINOR, INDIVIDUALLY AND IN THEIR OWN RIGHT AND NEW YORK PRIVATE TRUST COMPANY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ABINGTON MEMORIAL HOSPITAL D/B/A ABINGTON HOSPITAL-JEFFERSON HEALTH AND REGINA P. STURGIS-LEWIS AND JOEL I. POLIN | : | |
| SEAN WEST AND AMY WEST, AS PARENT AND NATURAL GUARDIAN OF JULIANA WEST, A MINOR, INDIVIDUALLY AND IN THEIR OWN RIGHT AND NEW YORK PRIVATE TRUST COMPANY | : | |
| | : | |
| v. | : | |
| | : | |
| ABINGTON MEMORIAL HOSPITAL D/B/A ABINGTON HOSPITAL-JEFFERSON HEALTH AND REGINA P. STURGIS-LEWIS AND JOEL I. POLIN | : | No. 1723 EDA 2023 |

Appeal from the Order Entered May 23, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2020-06779, 2020-20339

BEFORE: BOWES, J., OLSON, J., and McLAUGHLIN, J.

OPINION BY BOWES, J.:[*]                    **FILED AUGUST 28, 2025**

---

[*] This case was reassigned to the author on October 2, 2024.

Sean West and Amy West, as parents and natural guardians of Juliana West, a minor, individually and in their own right (collectively "the Wests") appeal from the order that granted the motion for judgment on the pleadings filed by Abington Memorial Hospital, Regina P. Sturgis-Lewis, M.S.N., and Joel I. Polin, M.D. (collectively "Appellees"). We affirm.

The trial court summarized the history of this case as follows:

> On April 18, 2008, [the Wests] filed a medical malpractice action against [Appellees] captioned as **West v. Abington Hospital**, et al., C.C.P. Montgomery County, No. 2008-09957 ("**West I**"). This medical malpractice action claimed damages due to the mismanagement of Amy West's labor and delivery resulting in the rupture of [her] uterus and catastrophic brain injuries to her child, Juliana West.

> A jury trial commenced on January 8, 2013. On January 16, 2013, following six days of trial and the conclusion of [the Wests]' case-in-chief, the parties notified the court that they agreed to settle the case for the full insurance policy limits of $19 million.

> On January 25, 2013, [the Wests] executed a Full and Final Release ("Release" or "Settlement Agreement") . . . . The Honorable Stanley A. Ott, then Administrative Judge of the Orphans' Court Division, approved the settlement and proposed distribution on March 14, 2013.

> On November 14, 2016, [the Wests] initiated [the instant action] in the Court of Common Pleas of Philadelphia County, claiming they were fraudulently induced to enter into the parties' settlement agreement in **West I** due to the hospital's failure to identify and produce an August 30, 2006 memo from Dr. Joel Polin, then Chair of Abington's OBGYN Department in discovery. The Polin memorandum (hereinafter "2006 Policy Memorandum") was issued less than six months before Amy West's labor and delivery. This document specifically addressed Pitocin use in labor and delivery and was responsive to [the Wests]' discovery requests in **West I**. [The Wests] allege this document was significant because the 2006 Policy Memorandum addressed the

same issue at the heart of **West I**—the risk of uterine rupture resulting from excessive oxytocin.[1] This document states in part:

> This reminder concerning the administration of oxytocin was prompted by the report of a uterine rupture in the September 2006 Green Journal. I have enclosed a copy of my memorandum of April 29, 2004, to strongly emphasize the principle, that the rate of oxytocin infusion must be decreased or discontinued, if more than 5 contractions are occurring in a 10 minute period or if contractions are lasting 2 minutes or longer, or if contractions are occurring within 1 minute of each other.

[The Wests] allege the 2006 Policy Memorandum recognized the relationship between pitocin-induced uterine hyperstimulation and uterine rupture, which was disputed by [Appellees] in **West I**. The 2006 Policy Memorandum emphasized that providers should decrease or discontinue Pitocin when strength and frequency of a patient's contractions were above a threshold number. [The Wests] claim the principles included in the 2006 Policy Memorandum required [Appellees] to decrease or discontinue Pitocin during Amy West's labor. The 2006 Policy Memorandum also referenced a Green Journal article relating a failure to properly administer Pitocin to uterine rupture and a preventable catastrophic outcome. [The Wests] aver the 2006 Policy Memorandum would have been critical to [the Wests]' liability and causation claims in **West I** and "devastating" to [Appellees] at trial.

[The Wests] first discovered the 2006 Policy Memorandum on March 9, 2015, when the hospital produced it during discovery in an unrelated case involving [the Wests]' attorneys . . . . [The Wests] claim that if the 2006 [document] had been produced in **West I**, they would have obtained a settlement or jury verdict substantially in excess of the $19 million settlement they negotiated.

. . . .

---

[1] The trial court refers to both oxytocin and Pitocin in its opinion. Pitocin is a synthetic version of the natural hormone oxytocin.

[The Wests] filed a complaint ("***West II***") in the instant matter against [Appellees] on November 14, 2016[,] claiming they were fraudulently induced to settle [***West I***]. [Appellees] filed preliminary objections to the complaint in ***West II*** and [the Wests] filed an amended complaint adding New York Private Trust Company, Trustee of the Juliana West Special Needs Trust, as a plaintiff. [Appellees] filed preliminary objections to the amended complaint on February 21, 2017 and [the Wests] filed a second amended complaint on March 13, 2017. On March 17, 2017, [the Wests] filed another action ("***West III***") asserting additional claims against [Appellees] for unjust enrichment and negligent misrepresentation.

The claims in both ***West II*** and ***West III*** allege that [Appellees] misrepresented the accuracy of document production in discovery of ***West I*** which fraudulently induced [the Wests] to settle ***West I*** for an amount less than they would have obtained in settlement or from a jury. [Appellees] filed preliminary objections in ***West II*** and ***West III*** on multiple grounds including, *inter alia*, improper venue and failure to state a cause of action upon which relief may be granted. The Philadelphia Court of Common Pleas sustained [Appellees]' preliminary objections regarding improper venue, deferred ruling on [Appellees]' demurrers and transferred ***West II*** and ***West III*** to [Montgomery County]. Thereafter, by order dated August 5, 2021, the [trial] court ordered that ***West II*** be consolidated with ***West III*** under case number 2020-06779 for all purposes including trial.

By order dated August 30, 2022, th[e trial] court sustained one of [Appellees]' preliminary objections (dismissing New York Private Trust Company as a plaintiff) and overruled the balance of [Appellees]' preliminary objections including [Appellees]' demurrer to the affirmative defense of the release executed in ***West I***. [Appellees] filed an answer and new matter . . . on November 9, 2022[,] pleading the Release in ***West I*** as an affirmative defense in new matter. [The Wests] replied to the new matter admitting that they executed a Release with [Appellees] and received the settlement funds. [The Wests] never tendered back the settlement proceeds obtained in exchange for the Release.

[Appellees] filed a motion for judgment on the pleadings on February 20, 2023. [The Wests] filed a response in opposition to

[Appellees]' motion on March 22, 2023. Th[e trial] court entered an order dated May 18, 2023[,] granting [Appellees]' motion for judgment on the pleadings. [The Wests] filed a timely appeal of this order.

Trial Court Opinion, 8/14/23, at 1-5 (cleaned up).

The trial court directed the Wests to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and they timely complied. The trial court thereafter authored a Rule 1925(a) opinion explaining its reasoning.

The Wests present the following questions for our consideration:

1. Did the trial court err in dismissing [the Wests]' claims against [Appellees] based on the parol evidence rule as applied to the **West I** Release, where (a) [the Wests]' claims center on misconduct by [Appellees] during discovery; and (b) the Release does not address [the instant] claims or the subject matter of discovery negligence, misrepresentation, or fraud?

2. Did the trial court err in dismissing [the Wests]' claims against the [Appellees] under the principle of contract affirmation, where [the Wests] assert claims that are not based on the Release and, in any event, Pennsylvania law allows for a plaintiff to affirm a contract and yet still seek damages for negligence, misrepresentation, and fraud without a waiver of those claims?

The Wests' brief at 3.

We begin with the applicable legal principles:

Our standard of review of the trial court's grant of judgment on the pleadings is *de novo* and our scope of review is plenary. Judgment on the pleadings is properly entered where the pleadings and documents admitted in the pleadings establish that there are no disputed issues of fact and that the defendant is entitled to judgment as a matter of law, or where accepting the well-pleaded factual averments of the plaintiff's complaint as true, the defendant is entitled to judgment as a matter of law.

- 5 -

*Mut. Benefit Ins. Co. v. Koser*, 318 A.3d 937, 940–41 (Pa.Super. 2024)

(cleaned up).

The primary question before us is whether the Release barred the Wests'

instant claims. In this vein, we have observed:

> [P]rinciples of contract law govern the interpretation and applicability of settlement agreements. Questions of contract interpretation are matters of law that we review *de novo*. A court determines the effect of a release from its language, and we give language its ordinary meaning unless the parties clearly intended a different meaning. A release ordinarily covers only such matters as can fairly be said to have been within the contemplation of the parties when the release was given. We must read portions of contractual language interdependently, considering their combined effects in the totality of the document.

*Prof'l Flooring Co., Inc. v. Bushar Corp.*, 152 A.3d 292, 299–300

(Pa.Super. 2016) (cleaned up). Furthermore:

> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.

*Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare*, 299 A.3d

937, 983–84 (Pa.Super. 2023) (cleaned up). We assume no words are mere

surplusage. *See*, *e.g.*, *Clarke v. MMG Ins. Co.*, 100 A.3d 271, 277

(Pa.Super. 2014) (observing that, if two provisions in the contract "were intended to have the same meaning, they would have the same language").

Where a written agreement contains an integration clause, "the law declares the writing to be not only the best, but the only, evidence of their agreement." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (cleaned up). "All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence." *Id*. (cleaned up). As we discuss more fully *infra*, claims that there was fraud in the **execution** of a contract are exempted from the parol evidence rule, but claims of fraud in the **inducement** are subject to the rule's constraints. *Id*. at 437 n.26.

With these principles in mind, we turn to the language of the writing executed by the Wests and Appellees. The Release provides, in pertinent part, as follows:

> 1. FOR AND IN CONSIDERATION of the sum of $19,000,000 (Nineteen Million Dollars) to be paid to the Wests, receipt of which is hereby acknowledged, the Wests do fully release and discharge [Appellees], from **any or all causes of action, claims and demands of whatsoever kind on account of all known and unknown injuries, losses and damages allegedly sustained by the undersigned**, and specifically from any claims or joinders for sole liability, contribution, indemnity or otherwise **as a result of, arising from, or in any way connected with** all medical professional health care services rendered by the above named Health Care Providers, and on account of which Legal Action was instated by the undersigned in the matter of [*West I*], instituted

by the [Wests] in the Court of Common Pleas, Montgomery County No: 2008-09957. All sums set forth herein constitute damages on account of physical injuries and sickness, within the meaning of Section 104(a)(2) of the Internal Revenue Code of 1086, as amended. The Wests do understand, and [agree], that the acceptance of said sum is in full accord and satisfaction of a disputed claim and that the payment of said sum is not an admission of liability by any party named herein.

2. It is expressly understood and agreed that **this release and settlement is intended to cover and does cover not only all now known injuries, losses, and damages, but any further injuries, losses and damages which arise from, or are related to, the occurrence set forth in the Legal Action noted above**.

3. The Wests hereby agree, on their behalf and on behalf of their heirs, executors, successors and/or assigns, to satisfy any and all valid liens, including the Medicaid Lien, that has or have been asserted and/or which could be or may be asserted for reimbursement of any medical benefits or other benefits provided to the [Wests] by a third party as a result of the injuries claimed in the Legal Action referenced herein. . . .

. . . .

6. It is further understood and agreed that this is the complete release agreement, and that **there are no written or oral understandings or agreements, directly or indirectly, connected with this release and settlement, that are not incorporated herein**. This agreement shall be binding upon and inure to the successors, assigns, heirs, executors, administrators, and legal representatives of the respective parties hereto.

. . . .

8. THE [WESTS] HEREBY [DECLARE] that the terms of this settlement have been completely read; and that [they have] discussed the terms of this settlement with legal counsel of [their] choice; and said terms are fully understood and voluntarily accepted for the purpose of making a full and final compromise adjustment and settlement of any and all claims on account of the injuries and damages above-mentioned, and for the express

purpose of **precluding forever any further or additional suits arising out of the aforesaid claims**.

Release, 1/25/13, at ¶¶ 1-3, 6, 8 (cleaned up, emphases added).

Turning to the issues raised on appeal, we first examine the Wests' contention that their current causes of action fall outside the scope of the Release. The Wests argue that the trial court erred in holding that the Release barred their claims in *West II* and *West III* because they released only their medical malpractice claims against Appellees, not any right to recover for negligence, misrepresentation, fraud, and unjust enrichment "as to claims that had not yet accrued in relation to misconduct during discovery." The Wests' brief at 18. They maintain that the parol evidence rule has no applicability here because their new causes of action do not require alteration or supplementation of the terms of the Release. *Id*. at 19. Instead, they insist that their new claims may proceed because they are premised upon matters about which the Release is silent. *Id*. at 25.

Appellees assert that the plain language of the Release does not support the Wests' contention that it is limited to malpractice claims. Rather, they argue that the express language of the Release more broadly indicates the parties' intention to resolve any and all claims related to the *West I* litigation. *See* Appellees' brief at 18-19. Appellees further argue that, even if the Release only precludes future claims for the alleged medical malpractice, *West II* and *West III* still may not proceed because their aim is to obtain "'damages in the amount of the full value of the underlying *West I* medical

negligence case.'" *Id*. at 25 (quoting Second Amended Complaint, 3/13/17, at ¶¶ 141, 148).

Upon careful review of the plain language of the Release, we agree with Appellees that the Wests' position relies upon too narrow an interpretation of the terms "arising from," "in any way connected with," and "arising out of" appearing in ¶¶ 1, 2, and 8 of the Release. The plain meaning of the word "arising" is "(1) (a) : to begin to occur or to exist : to come into being or to attention . . . (b) : to originate from a source." https://www.merriam-webster.com/dictionary/arising (cleaned up, internal parentheses added).

In this vein, Pennsylvania appellate courts have long observed in interpreting various types of writings that "the phrase 'arising out of' [means] 'causally connected with' (but for causation), and not proximate causation." ***Werner v. 1281 King Associates, LLC***, 327 A.3d 291, 300 (Pa.Super. 2024) (holding clause of contract providing for the release of all claims "in any way arising out of, relating to, or having any connection with the Distributor Agreement" clearly and unambiguously barred claims for personal injuries sustained while the plaintiff was making a delivery because he would not have been on the premises but for his duties under that agreement) (citing, *inter alia*, ***McCabe v. Old Republic Ins. Co.***, 228 A.2d 901, 903 (Pa. 1967) (holding the term "arising out of" was clear and definite and included incident with "an obvious causal connection" to the injured party's employment); ***Manufacturers Cas. Ins. Co. v. Goodville Mut. Cas. Co.***, 170 A.2d 571,

- 10 -

573 (Pa. 1961) (same, but construing insurance contract strictly in favor of coverage upon finding the term ambiguous as used in that particular contract)).[2]

The term "in any way connected with" is, on its face, even broader, requiring no cause and result relationship between the past claims and the present suits, but merely some logical association between the malpractice and the new damages claim. ***See*** https://www.merriam-webster.com/dictionary/connected (defining "connected" as "(1): joined or linked together (2) : having the parts or elements logically linked together") (internal parentheses added).

Here, the Wests have instituted new suits seeking damages to be calculated as the difference between (1) the $19 million for which they agreed to settle their claims for the injuries they suffered as a result of Appellees'

_____

[2] ***See also Buttermore v. Aliquippa Hosp.***, 561 A.2d 733, 735 (Pa. 1989) (holding release of driver and all other persons of all causes of action arising from car accident barred claims against hospital for negligence in their post-accident treatment of the injured party); ***Schweitzer v. Aetna Life & Cas. Co.***, 452 A.2d 735, 737 (Pa.Super. 1982) (concluding the term "arising out of the maintenance or use of a motor vehicle" in the No-fault Motor Vehicle Insurance Act did not require proximate causation, but "some connection, more than mere chance or happenstance, between the injuries sustained and the insured vehicle").

The Dissent goes to great lengths to distinguish the precedent we have cited. ***See*** Dissenting Opinion at 5-8. We readily agree that the various "arising out of" cases are distinct from the instant case and from each other. Our point in citing them is to show that for decades, in a variety of contexts, the phrase "arising out of" has been understood to broadly indicate some causal connection, not direct or proximate causation.

provision of healthcare services, and (2) the amount that they would have received for those claims had they not relied to their detriment on Appellees' representation that they had produced all documents responsive to the Wests' discovery requests. These suits are not only "in any way connected with" the occurrence underlying the claims the Wests released, they originated from the same source: the alleged malpractice. Had not the initial provision of medical services taken place, **West I** would not have been filed and Appellees would have had no cause to produce the discovery documents alleged in **West II** and **West III** to have been wrongfully withheld. To prevail in **West II** and **West III**, the Wests would essentially have to relitigate the underlying medical malpractice case to prove that the production of an additional document pertinent to the standard of care would have increased the jury's assessment of the losses the Wests sustained by virtue of Appellees' deviation from that standard. Appellees' provision of medical services was thus a but-for cause of the instant controversies.[3]

_____

[3] The Dissent concludes that "[t]he instant tort claims are not 'connected with' the rendering of medical professional health care services. Rather, they arise out of wholly separate malfeasance allegedly committed during the subsequent litigation." Dissenting Opinion at 2. However, the Dissent fails to explain how the instant actions seeking the supposed true value of the malpractice claims are not "in any way connected with" the underlying malpractice, even if not directly arising out of the provision of health care services. The Dissent merely states: "the instant claims are not about the medical care, but rather fraudulent conduct during the ensuing litigation[,]" and cites three cases concerning "[f]raud in the inducement to sign a release[.]" **Id**. at 8. Significantly, the Dissent's turn of phrase blends the concepts of fraud in the inducement, to which the parol evidence rule applies,

Moreover, this interpretation of ¶¶ 1 and 2 of the Release is consistent with, and reinforced, by ¶ 8 in which the Wests declared that they were "making a full and final compromise adjustment and settlement of any and all claims on account of the injuries and damages above-mentioned, and for the express purpose of **precluding forever any further or additional suits arising out of the aforesaid claims**." Release, 1/25/13, at ¶ 8. In this paragraph, the Wests acknowledged that they were releasing not only **West**

---

and fraud in the execution (*i.e.*, "signing"), which does not implicate the parol evidence rule. ***See Toy v. Metro. Life Ins. Co.***, 928 A.2d 186, 206 (Pa. 2007).

Further, the cases cited by the Dissent are inapposite. ***See Del Pielago v. Orwig***, 151 A.3d 608, 613-18 (Pa.Super. 2016) (collecting cases involving "physical or mental incapacitation of the party presented with a release, his inability to read or understand," and "taking advantage of a person's alleged incapacity at the time a release is signed"); ***Eigen v. Textron Lycoming Reciprocating Engine Div.***, 874 A.2d 1179, 1182 (Pa.Super. 2005) (reversing order to enforce settlement agreement, alleged to have been fraudulently induced by a misrepresentation about the availability of insurance coverage, reached in the midst of trial, giving no indication that the agreement was memorialized in a written release, let alone one that contained an integration clause); ***Briggs v. Erie Ins. Grp.***, 594 A.2d 761 (Pa.Super. 1991) ("Where, as here, it is alleged that an insurance company misrepresents a material fact to induce settlement, such as the limits of the applicable policy, and this misrepresentation causes a settlement to occur, the plaintiff who can prove this fraudulent conduct is entitled to damages."). While we agree with our esteemed colleague that the Wests' allegations raise serious ethical questions, we do not find the omission of a document in discovery is tantamount to taking advantage of an incapacitated person or an affirmative misrepresentation about the insurance coverage or settlement funds available.

In any event, as discussed above, by the plain, unambiguous language of the Release, the Wests discharged not only claims "about the medical care," but also any and all claims for unknown losses and damages in any way connected with the medical care.

*I*'s claims for the injuries sustained from Appellees' provision of medical services, but were further forfeiting the right to bring any additional claims arising out of those claims. The instant additional suits alleging Appellees' malfeasance in litigating **West I** have "an obvious causal connection" with the aforesaid claims. **McCabe**, 228 A.2d at 903. As such, **West II** and **West III** arose out of the **West I** claims and are precluded by the Release.

Accordingly, we hold that the actions *sub judice* arose from the underlying provision of medical services and from the claims litigated in **West I**. Consequently, the Release discharged the new claims and precluded these new suits raising them unless the Wests are able to avoid the terms of that agreement, in particular its integration clause.

The Wests do not dispute that the Release was a fully integrated contract. Indeed, as highlighted above, the Release expressly provided: "It is further understood and agreed that this is the complete release agreement, and that there are no written or oral understandings or agreements, directly or indirectly, connected with this release and settlement, that are not incorporated herein." Release, 1/25/13, at ¶ 6.

Yet, the Wests allege in the instant actions that Appellees made fraudulent misrepresentations upon which the Wests justifiably relied in agreeing to settle **West I**. **See**, **e.g.**, Second Amended Complaint, 3/13/17, at ¶¶ 137-39 (pleading that the Wests justifiably relied upon Appellees' discovery responses in deciding to agree to the Release). Stated differently,

contrary to the terms of the Release, the Wests seek to prove their claims of fraud in the inducement by establishing that there actually were other understandings directly or indirectly connected with the settlement that were not incorporated in the Release. To do so would necessitate parol evidence.

This Court has summarized the parol evidence rule and its application in this context as follows:

> Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract. One exception to this general rule is that parol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake. In addition, where a term in the parties' contract is ambiguous, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.

*Yocca*, 854 A.2d at 436–37. Critically, our High Court has made it plain that,

> while parol evidence may be introduced based on a party's claim that there was a fraud in the execution of the contract, *i.e.*, that a term was fraudulently omitted from the contract, **parol evidence may not be admitted based on a claim that there was fraud in the inducement of the contract, *i.e.*, that an opposing party made false representations that induced the complaining party to agree to the contract**.

*Id*. at 437 n.26 (cleaned up, emphasis added).

Here, the Wests acknowledge that they do "not seek to expand or alter the terms of the written release[.]" The Wests' brief at 28. Hence, they do not allege a claim of fraud in the execution that would be permissible despite

- 15 -

the parol evidence rule. Instead, they seek to prove that Appellees made false representations that induced them to agree to the Release. However, based upon Pennsylvania law, the Wests are prohibited from admitting evidence to show that they signed an agreement, which indicated that it did not include any understanding that did not appear within the writing, because they had justifiably relied upon an understanding that was not included in the writing.

We reject the Wests' suggestion that our decision in *Murray v. University of Pennsylvania Hospital*, 490 A.2d 839 (Pa.Super. 1985), requires the opposite result. They cite *Murray* for the proposition that a release does not bar a subsequent action for additional injuries "beyond the terms of the underlying contract," where the totality of the circumstances suggest that the written contract was not the full agreement. *See* the Wests' brief at 22-25.

In *Murray*, a doctor guaranteed the patient prior to a tubal ligation procedure that the surgery would prevent any future pregnancies. After she became pregnant again, she successfully sued for breach of the oral agreement. On appeal, the medical providers argued that the parol evidence rule precluded the patient from proving the existence of the warranty because the patient signed a pre-surgery authorization and release that did not include the guarantee. This Court held that parol evidence was admissible to establish that the authorization was not intended to be the entire agreement between

the parties, and that the surgeon had indeed warranted that there would be no future pregnancies. *See Murray*, 490 A.2d at 844.

Glaringly absent from our analysis of the surgery authorization in *Murray* was any mention of an integration clause. As Appellees note: "Surely the [*Murray* C]ourt would have mentioned the existence of an integration clause had the writing included one." Appellees' brief at 27 n.6. In any event, *Murray* plainly does not stand for the proposition that parol evidence is admissible to override an express intention that a written agreement constitutes the entire agreement between the parties.[4]

Our Supreme Court long ago explained the rationale for the rule that a party cannot disavow an integration clause merely by asserting that an unincluded representation was fraudulently made:

> There is not the slightest doubt that if plaintiffs had merely averred the falsity of the alleged oral representations, parol evidence thereof would have been inadmissible. Does the fact that plaintiffs further averred that these oral representations were fraudulently made without averring that they were fraudulently or by accident or mistake omitted from the subsequent complete written contract suffice to make the testimony admissible? The answer to this question is 'no'; if it were otherwise the parol evidence rule would become a mockery, because all a party to the written contract would have to do to avoid, modify or nullify it

---

[4] Likewise, our ruling in *Gasbarre Products, Inc. v. Smith*, 270 A.3d 1209, 1221 (Pa.Super. 2022), that parol evidence was properly admitted to determine whether the parties intended an outline drafted at the conclusion of a negotiation meeting to be their entire agreement, is inapposite. As in *Murray*, there appears to have been no integration clause in the writing at issue in *Gasbarre*. In contrast, the Release at issue in the instant case included a term expressly acknowledging that it was the intent of the parties for the writing to be fully integrated.

would be to aver (and prove) that the false representations were fraudulently made.

**Bardwell v. Willis Co.**, 100 A.2d 102, 104 (Pa. 1953). The Court continued:

> What is the use of inserting such clauses in agreements if one of the parties thereto is permitted to prove by oral testimony [statements contrary to the writing]? There is no averment by plaintiffs that these clauses in the lease were inserted by fraud, accident or mistake; or (we repeat) that any representation was omitted by fraud, accident or mistake; or that the lease did not contain the entire contract and agreement between the parties. Merely bringing an action in trespass for deceit instead of in assumpsit for breach of contract will not suffice to circumvent the parol evidence rule. **If plaintiffs relied on any understanding, promises, representations or agreements made prior to the execution of the written contract or lease, they should have protected themselves by incorporating in the written agreement the promises or representations upon which they now rely, and they should have omitted the provisions which they now desire to repudiate and nullify**.

*Id*. at 105 (emphasis added).

The trial court properly observed that the Wests did not insist that the Release contain "protective language preserving [their] right to pursue an action based upon [Appellees'] alleged misrepresentation in discovery." Trial Court Opinion, 8/14/23, at 7. Instead, they signed a contract acknowledging that they had no understandings omitted therefrom, agreeing to accept $19 million in exchange for a release of any and all claims for known and unknown injuries connected in any way with the medical services Appellees rendered.

Consequently, the trial court correctly granted Appellees' motion for judgment on the pleadings because the Wests' new claims were barred by the Release.[5] Therefore, we affirm.

Order affirmed.

Judge Olson joins this Opinion.

Judge McLaughlin files a Dissenting Opinion.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/28/2025

---

[5] Since we conclude that the **West II** and **West III** claims were precluded for this reason, we need not consider the trial court's alternative rationale concerning the Wests' failure to tender back the proceeds of the **West I** settlement.